UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHARLES PATEMAN,

                              Plaintiff,

        v.

THE CITY OF WHITE PLAINS, *et al.*,

                              Defendants.

No. 17-CV-6156 (KMK)

OPINION & ORDER

Appearances:

Randolph M. McLaughlin, Esq.
Debra S. Cohen, Esq.
Newman Ferrara LLP
New York, NY
*Counsel for Plaintiff*

Eliza M. Scheibel, Esq.
John M. Flannery, Esq.
Lalit K. Loomba, Esq.
Peter A. Meisels, Esq.
Wilson Elser Moskowitz Edelman & Dicker LLP
White Plains, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

        Plaintiff Charles M. Pateman ("Plaintiff") brings this Action, pursuant to 42 U.S.C.

§ 1983 and New York State law, against the City of White Plains ("White Plains"), Sergeant

("Sgt.") LaValle Larrier ("Larrier"), Police Officer ("P.O.") Paul Wenzel ("Wenzel"), Lieutenant

("Lt.") Edward Robinson ("Robinson"), and P.O.s John Does 1-10 (collectively, "Defendants"),

alleging that Defendants violated his rights under the Fourth and Fourteenth Amendments to the

United States Constitution and New York State Law.  (See Am. Compl. (Dkt. No. 24).)  Plaintiff

brings the following claims: (1) federal claims under § 1983 against Larrier, Wenzel, and

Robinson for excessive force; (2) federal claims under § 1983 against Larrier, Wenzel, and Robinson for inadequate medical treatment; (3) federal claims under § 1983 against Robinson and John Does 1-10 for failure to intervene; (4) federal claims under § 1983 against Larrier and Robinson for supervisory liability; (5) state law assault and battery claims against Larrier and Wenzel; (6) state law negligence claims against all Defendants; (7) state law intentional infliction of emotional distress ("IIED") claims against all Defendants; and (8) state law respondeat superior claims against White Plains.

Before the Court is a Motion for Summary Judgment on behalf of Defendants (the "Motion"). (Defs.' Not. of Mot. ("Not. of Mot.") (Dkt. No. 63).) For the following reasons, the Motion is granted in part and denied in part.

## I. Background

### A. Factual Background

The following facts are taken from Defendants' statement pursuant to Local Civil Rule 56.1, (Defs.' Local Rule 56.1 Statement ("Defs.' 56.1") (Dkt. No. 64)), Plaintiff's statement pursuant to Local Civil Rule 56.1, (Pl.'s Local Rule 56.1 Statement ("Pl.'s 56.1") (Dkt. No. 68)), and the admissible evidence submitted by the Parties.[1] The Court recounts only those facts necessary for consideration of the instant Motion.

---

[1] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civ. R. 56.1(a). The nonmoving party must then submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." *Id.* at 56.1(b). "If the opposing party . . . fails to controvert a fact set forth in the movant's Rule 56.1 statement, that fact will be deemed admitted pursuant to the local rule." *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (citation and quotation marks omitted); *see also T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (same). Where possible, the Court relies on the facts as presented in the Parties' statements of fact.

1.  The Parties' Backgrounds

Plaintiff is a resident of Westchester County and, at the time of the incidents described herein, was 72 years old.  (Defs.' 56.1 ¶ 1 (citing Decl. of Lalit K. Loomba, Esq. in Supp. of Mot. ("Loomba Decl.") Ex. A ("Am. Compl.") ¶ 11 (Dkt. Nos. 65, 65-1); Pl.'s 56.1 ¶¶ 131–32 (citing Am. Compl. ¶ 11).)  During the relevant period, Plaintiff had suffered "progressive back and neck pain" for a couple of weeks before the incidents, which made it difficult to take stairs and rise from seated positions.  (*Id.* ¶ 138 (citing Decl. of Debra S. Cohen, Esq ("Cohen Decl.") Ex. 18 ("Medical Records"), at 24–28 (Dkt. Nos. 67, 67-18); *id.* Ex. 19 ("Robbins Dep. Tr."), at 38 (Dkt. No. 67-19)).)[2]  Plaintiff was also under monitoring for "Factor VIII deficiency," a blood-clotting disorder from which he believed he suffered on the day of the incidents.  (*Id.* ¶ 139 (citing Cohen Decl. Ex. 20 ("Chorny Dep. Tr."), at 31 (Dkt. No. 67-20); *id.* Ex. 5 ("Pl.'s Pl. Dep. Tr."), at 59 (Dkt. No. 67-5); Medical Records 24–28); Defs.' 56.1 ¶ 70 (citing Loomba Decl. Ex. C ("Defs.' Pl. Dep. Tr."), at 105 (Dkt. No. 65-3)).)[3]  Plaintiff also has vascular purpua, which can cause easy bruising and recently formed bruises to "tear and easily bleed" when they are subjected to local trauma.  (*Id.* ¶¶ 77–78, 80, 82 (citing Loomba Decl. Ex. N ("Defs.' Thakur Dep. Tr."), at 38–39, 41–44 (Dkt. No. 65-14)).)  Given Plaintiff's age and history of smoking, he also has a deficiency of subcutaneous tissue, or "thin skin."  (*Id.* ¶ 81 (citing Defs.' Thakur Dep. Tr. 42–43).)  Prior to January 25, 2017, Plaintiff had surgeries on both of his knees and right

_____

However, direct citations to the record are used where the Parties' statements of fact do not include relevant facts or do not accurately characterize the record.

[2] Although the Medical Records include bates stamps at the bottom of each page, the page numbers are not consecutive.  Thus, the Court refers to the ECF-stamped page numbers at the top of the page to avoid confusion.

[3] It was later determined by Plaintiff's orthopedist that Plaintiff does not suffer from Factor VIII deficiency.  (Pl.'s 56.1 ¶ 70 (citing Pl.'s Pl. Dep. Tr. 101–05).)

shoulder rotator cuff, where he suffered from "poor function," as well as bariatric weight loss surgery. (Pl.'s 56.1 ¶¶ 141–44 (citing Cohen Decl. Ex. 21 ("Spencer Dep. Tr."), at 16–17 (Dkt. No. 67-21); Pl.'s Pl. Dep. Tr. 17–18; Medical Records 14).) As of January 25, 2017, Plaintiff was taking blood pressure and cholesterol medication, and had also been a habitual smoker, smoking approximately one and a half packs of cigarettes a day for 50 years. (Defs.' 56.1 ¶¶ 15, 79 (citing Defs.' Pl. Dep. Tr. 59–61, 205–07); Pl.'s 56.1 ¶ 15 (citing Pl.'s Pl. Dep. Tr. 7–10, 59).)

At the time of the incidents, Plaintiff was engaged to Ada Sanders ("Sanders") who resided at 33 Barker Avenue, Apartment 6F in White Plains, NY. (Defs.' 56.1 ¶¶ 6–7 (citing Defs.' Pl. Dep. Tr. 238; Loomba Decl. Ex. D ("Defs.' Sanders Dep. Tr."), at 11–13 (Dkt. No. 65-4)); Pl.'s 56.1 ¶ 136 (citing Cohen Decl. Ex. 2 ("Pl.'s Sanders Dep. Tr."), at 89–90 (Dkt. No. 67-2)).) Sanders's daughter, Jacqueline Benge ("Benge") lived with her two-year old daughter at Plaintiff's home in Irvington, New York, as they had done "for a few years prior." (Defs.' 56.1 ¶¶ 9–10 (citing Defs.' Pl. Dep. Tr. 24–25; Defs.' Sanders Dep. Tr. 9–10, 17–18, 22; Loomba Decl. Ex. E ("Dispatch Recordings") No. 69 (Dkt. No. 65-5)); Pl.'s 56.1 ¶ 10 (citing Pl.'s Sanders Dep. Tr. 20–21).)[4]

Larrier is a sergeant and Robinson is a lieutenant at the White Plains Police Department ("WPPD"). (Defs.' 56.1 ¶¶ 3, 5 (citing Am. Compl. ¶¶ 13, 15).) Wenzel was a police officer at WPPD at the time of the relevant incidents but resigned on September 20, 2017. (*Id.* ¶ 4 (citing Am. Compl. ¶ 14); Pl.'s 56.1 ¶ 4 (citing Cohen Decl. Ex. 1 ("Pl.'s Wenzel Dep. Tr."), at 15 (Dkt. No. 67-1)).) Wenzel's last day of service was October 4, 2017. (*Id.*)

---

[4] Defendants have provided dispatch recordings from January 25, 2017 (the "Dispatch Recordings") to the Court on a disc. The recordings are numbered Nos. 1–213. The Court refers to the number of each referenced recording herein.

## 2. 33 Barker Avenue Incidents

On January 25, 2017, WPPD received a call from Benge at 8:50 p.m. requesting assistance with a domestic dispute at 33 Barker Avenue. (Defs.' 56.1 ¶¶ 8–9 (citing Dispatch Recordings No. 69; Defs.' Sanders Dep. Tr. 22); Pl.'s 56.1 ¶ 8 (citing Dispatch Recordings Nos. 69, 75).) WPPD dispatched officers to the scene upon receiving the call. (Defs.' 56.1 ¶ 11 (citing Dispatch Recordings Nos. 75–76).) Meanwhile, Sanders called Plaintiff and asked him to come to the apartment right away to help with Benge, who Plaintiff said was "freaking out." (Pl.'s 56.1 ¶ 13 (citing Pl.'s Pl. Dep. Tr. 64; Pl.'s Sanders Dep. Tr. 22–23).) When Plaintiff received the call, he was in his driveway arriving home from dinner with a friend where he had had two to three glasses of wine. (Defs.' 56.1 ¶ 14 (citing Defs.' Pl. Dep. Tr. 56–58, 63–64).)[5] Plaintiff immediately drove to 33 Barker Avenue. (*Id.* ¶ 16 (citing Defs.' Pl. Dep. Tr. 65).)

Larrier and Wenzel were two of the WPPD officers who responded to the call. (*Id.* ¶ 12 (citing Loomba Decl. Ex. F ("Defs.' Larrier Dep. Tr."), at 34 (Dkt. No. 65-6); *id.* Ex. G ("Defs.' Wenzel Dep. Tr."), at 34 (Dkt. No. 65-7); Dispatch Recordings No. 71).) Three other officers also responded to the call and were on the sixth floor of 33 Barker Avenue by the time Larrier and Wenzel arrived. (Pl.'s 56.1 ¶ 12 (citing Dispatch Recordings Nos. 73, 77, 91; Cohen Decl. Ex. 3 ("Pl.'s Larrier Dep. Tr."), at 53–68 (Dkt. No. 67-3); *id.* Ex. 4 ("Pl.'s Larrier Video"), at 15:33–16:17 (Dkt. No. 67-4)).)[6] Larrier was the patrol supervisor on duty that evening, (*id.*), and

_____

[5] Plaintiff testified at an examination held pursuant to Section 50-h of the New York General Municipal Law ("50-h Hearing") that he had one glass of wine at dinner. (Pl.'s 56.1 ¶ 14 (citing Cohen Decl. Ex. 6 ("Pl.'s 50-h Tr."), at 109 (Dkt. No. 67-6)).)

[6] Both Plaintiff and Defendants submitted video excerpts from the body cameras of Larrier ("Larrier Video") and Wenzel ("Wenzel Video"). (Defs.' 56.1 ¶ 34; Pl.'s 56.1 ¶ 34.) Both videos contain audio tracks for all but the first 30 seconds. (Defs.' 56.1 ¶ 35 (citing Defs.' Larrier Dep. Tr. 36–38).) Although a body camera is always recording video, a police officer must tap the body camera to turn on the audio function. (Defs.' Larrier Dep. Tr. 36.) Thus, the

he and Wenzel arrived just before Plaintiff, (Defs.' 56.1 ¶ 17 (citing Defs.' Wenzel Dep. Tr. 72–74, 79).) As patrol supervisor, Larrier was responsible for "assist[ing] . . . officers with anything they need." (Pl.'s Larrier Dep. Tr. 54.)

According to Plaintiff, he did not see or encounter any police officers outside of 33 Barker Avenue when he parked his car, a Lincoln, but he did see three to four police cars parked outside. (Pl.'s 56.1 ¶¶ 18, 147 (citing Pl.'s Pl. Dep. Tr. at 68–69; Pl.'s Sanders Dep. Tr. 29).) According to Larrier, he first saw Plaintiff drive up in a Cadillac when he was about to enter the apartment building. (Defs.' 56.1 ¶ 18 (citing Defs.' Larrier Dep. Tr. 101).) Larrier recalled that Plaintiff had his window down and that he was yelling, which Plaintiff disputes. (*Id.*; Pl.'s 56.1 ¶ 18 (citing Pl.'s Pl. Dep. Tr. 68–69; Pl.'s Sanders Dep. Tr. 29).) Larrier instructed Wenzel to find out what Plaintiff was saying. (Defs.' 56.1 ¶ 19 (citing Defs.' Larrier Dep. Tr. 101; Defs.' Wenzel Dep. Tr. 79–80).) Wenzel waited outside for Plaintiff to get out of his car, and when Plaintiff arrived, they spoke at the front door of 33 Barker Avenue. (Pl.'s 56.1 ¶¶ 19, 23, 149 (citing Pl.'s Wenzel Dep. Tr. 79–81; Pl.'s Pl. Dep. Tr. at 68–75; Pl.'s 50-h Tr. 80–81).) They also may have spoken at Plaintiff's car. (Pl.'s Larrier Tr. 101–02.) According to Wenzel, Plaintiff told him that he was the husband of the woman involved in the dispute, and that he was there because of the reported incident. (Defs.' 56.1 ¶¶ 20, 23 (citing Defs.' Larrier Dep. Tr. 101–02; Loomba Decl. Ex. H ("Defs.' 50-h Tr."), at 80 (Dkt. No. 65-8)).) Wenzel explained that he and Plaintiff "convers[ed] as two gentlemen, and . . . didn't have any issues." (Pl.'s 56.1 ¶ 21 (citing Pl.'s Wenzel Dep. Tr. 79–81).) Wenzel and Plaintiff spoke in the vestibule before Plaintiff pressed the buzzer to Sanders's apartment at Wenzel's request, and Wenzel then opened

---

Larrier and Wenzel Videos include video from 30 seconds prior to activation, but do not include audio for this period. (Defs.' 56.1 ¶¶ 35–36.)

the building door, and Plaintiff followed him into the building. (*Id.* ¶¶ 20, 151 (citing Loomba

Decl. Ex. I ("Lobby Video"), at 0:30–0:40 (Dkt. No. 65-9); Pl.'s Wenzel Dep. Tr. 79–81).)[7]

According to Plaintiff, Wenzel informed him when they were speaking that he would not be

allowed upstairs. (Defs.' Pl. Dep. Tr. 74.) Plaintiff asked why and told Wenzel that he could

solve the issue "immediately." (*Id.*)

When Plaintiff and Wenzel entered the lobby, Larrier was already standing by the

elevator. (Defs.' 56.1 ¶ 22 (citing Defs.' Larrier Dep. Tr. 102); Pl.'s 56.1 ¶ 152 (citing Lobby

Video 0:41–0:45; Pl.'s Pl. Dep. Tr. 74; Pl.'s 50-h Tr. 82).) As Plaintiff walked towards the

elevator, he appears to have had his left hand in the air, and, as he spoke to Larrier, extended his

right, and later left, pointer finger in the air. (Lobby Video 0:39–1:24.) Plaintiff and Larrier then

conversed by the elevator while Wenzel stood to the side. (*Id.*) Plaintiff informed Larrier that

his wife needed him because she was having a fight. (Pl.'s 56.1 ¶¶ 30, 32 (citing Lobby Video

1:08–2:06; Cohen Decl. Ex. 7 ("Pl.'s Wenzel Video"), at 0:43–1:03 (Dkt. No. 67-7); Pl.'s Larrier

Dep. Tr. 103).) Wenzel and Larrier wanted Plaintiff to stay downstairs in the lobby, which

Plaintiff understood, but he indicated that he thought he had a "right to go to [his] family."

(Defs.' 56.1 ¶ 31 (citing Defs.' Pl. Dep. Tr. 76–77); Defs.' Pl. Dep. Tr. 77.)

According to Larrier, Plaintiff began to yell, which Plaintiff disputes, leading Larrier and

Wenzel to activate their body cameras. (Defs.' 56.1 ¶ 33 (citing Defs.' Larrier Dep. Tr. 38, 100,

104); Pl.'s 56.1 ¶ 33 (citing Lobby Video 0:33–1:33; Pl.'s Wenzel Video 0:00–0:30; Pl.'s Pl.

---

[7] The video referenced herein (the "Lobby Video") includes "six separate camera images." (Defs.' 56.1 ¶ 27 (citing Loomba Decl. ¶ 11).) According to Defendants, "upon information and belief," the Lobby Video was recorded by a cell phone from a video monitor at 33 Barker Avenue. (*Id.*) Besides an inaccurate time stamp, the Parties do not dispute the accuracy of the Lobby Video, which does not include audio. (*Id.* ¶¶ 28, 30 (citing Loomba Decl. ¶ 12).)

Dep. Tr. 84–92).)  Plaintiff asked Larrier why he could not see his wife, and informed him that

he knew what was going on and that he lived in the apartment.  (Loomba Decl. Ex. J ("Defs.'

Larrier Video"), at 0:30–0:40 (Dkt. No. 65-10).)  Larrier told Plaintiff that he had officers

upstairs, that Plaintiff could not go upstairs yet, and asked him to sit down.  (Defs.' 56.1 ¶ 37

(citing Defs.' Larrier Dep. Tr. 103; Defs.' Larrier Video 0:30–1:00).)  In particular, Larrier told

Plaintiff, "I have no idea what's going on upstairs . . .  I have officers up there, we're going to

figure out what's going on. . . . I'm not introducing another dynamic."  (Defs.' Larrier Video

0:35–0:50.)  Plaintiff protested and informed Larrier that he was wrong to stop him from going

into "[his] house."  (Defs.' 56.1 ¶ 38 (citing Defs.' Larrier Video 0:55–1:05); Defs.' Larrier

Video 0:58–0:59.)  Plaintiff also told Larrier that he knew "all [his] guys over there," presumably

at WPPD, and began to name officers.  (Defs.' 56.1 ¶ 43 (citing Defs.' Larrier Video 0:45–1:10);

Defs.' Larrier Video 0:50–0:59.)[8]

Plaintiff began to repeatedly state, "Arrest me," as he moved towards the elevator.

(Defs.' Larrier Video 1:02–1:05.)[9]  Larrier put out his arm to stop Plaintiff and appears to have

briefly touched Plaintiff's right wrist.  (*Id.* at 1:03–1:07; Loomba Decl. Ex. K ("Defs.' Wenzel

Video"), at 0:42–0:44 (Dkt. No. 65-11).)  Plaintiff initially stepped back, repeatedly telling

Larrier to arrest him, and then moved toward the elevator once more, stating, "I'm going up," as

Larrier again put out his hand to stop him.  (Defs.' Larrier Video 1:07–1:21; Defs.' Wenzel

Video 0:55–1:01.)  Larrier told Plaintiff not to "put [his] hands on [Larrier] again," to which

[8] Plaintiff testified during his deposition that he did not act respectfully to Larrier.
(Defs.' 56.1 ¶ 44 (citing Defs.' Pl. Dep. Tr. 84–85, 88–90).)

[9] Plaintiff previously testified that he did not attempt to get on the elevator, but does not
dispute this fact in this 56.1 Statement.  (Defs.' Pl. Dep. Tr. 87; Pl.'s 56.1 ¶¶ 43, 45, 48–49, 52.)

Plaintiff replied, "I didn't put my hands on you . . . [D]on't you tell me I put my hands on you," while he and Larrier stood close to each other's faces. (Defs.' 56.1 ¶¶ 46–47 (citing Defs.' Larrier Video 1:15–1:30); Defs.' Wenzel Video 1:00–1:05.) As Plaintiff moved closer to Larrier, Larrier put his finger on Plaintiff's chest as Plaintiff moved backward and instructed Plaintiff to "back out of [his] face." (Defs.' Larrier Video 1:23–1:28.) Plaintiff then walked toward Wenzel, asking whether he saw Plaintiff put his hands on Larrier. (*Id.* at 1:28–1:31.) Wenzel told Plaintiff to "calm down and hang out here," as Plaintiff walked back to Larrier. (*Id.* at 1:33–1:47.) Larrier instructed Plaintiff, "You're not going upstairs like this, I'm not giving you a choice," and told him to "sit down and relax." (*Id.*) Plaintiff repeatedly stated that he was "going upstairs" and that he would not stay in the lobby. (*Id.*) Larrier informed Plaintiff that he was "stopping [him] from doing [his] job," to which Plaintiff responded, "[Y]ou are stopping me from doing my job." (Defs.' 56.1 ¶¶ 48–49 (citing Defs.' Larrier Dep. Tr. 105; Defs.' Larrier Video 1:40–2:00; Pl.'s Dep. Tr. 87–89).) As Larrier pushed the elevator button, he held out one arm to block Plaintiff. (Defs.' Larrier Video 1:50–1:59.) Plaintiff repeatedly told Larrier that he would have to arrest him as he continued to try to get on the elevator, and Larrier put his hand on Plaintiff's chest to stop him. (Defs.' 56.1 ¶ 50 (citing Larrier Dep. Tr. 105; Defs.' 50-h Tr. 99–100; Defs.' Larrier Video 1:55–2:00; Lobby Video 1:15–2:21); Defs.' Larrier Video 1:55–2:00.)

Larrier then told Plaintiff that he was under arrest, instructing Plaintiff to put his hands behind his back. (Defs.' 56.1 ¶ 52 (citing Defs.' Larrier Dep. Tr. 105–06, 111; Defs.' Larrier Video 1:58–2:02).) According to Defendants, Plaintiff "continued to act uncooperatively," and "physically resisted and struggled," forcing the officers to "place [Plaintiff] up against a wall in a standing position" to handcuff him. (*Id.* ¶¶ 53–54 (citing Defs.' Larrier Dep. Tr. 111–12, 115–18, 122–27; Defs.' Larrier Video 2:00–2:26; Defs.' Wenzel Dep. Tr. 61–62, 89–91; Lobby

Video 2:20–2:35; Defs.' Wenzel Video 1:30–1:45).)  At one point during his arrest, Plaintiff

swung his right hand into Wenzel's chest, which hit him close to, or on, his body camera, and

"forcefully mov[ed]" his right hand from the center of his back, until Larrier and Wenzel were

able to handcuff him.  (*Id.* ¶¶ 55–56, 58 (citing Defs.' Wenzel Video 1:30–2:00; Lobby Video

2:20–2:45; Defs.' Larrier Video 2:00–2:26; Defs.' Larrier Dep. Tr. 122–27; Wenzel Dep. Tr. 61–

62, 89–91).)  Plaintiff disputes this description, instead stating that he did not physically struggle

and was "pushed" by the officers while he tried to speak to them.  (Pl.'s 56.1 ¶ 54 (citing Pl.'s Pl.

Dep. Tr. 92–96; Pl.'s 50-h Tr. 102; Pl.'s Wenzel Video 1:39–2:02).)  According to Plaintiff,

Larrier "forcefully twisted" Plaintiff's arms behind his back, and "turned him around" to

handcuff him, while Wenzel put handcuffs on one of Plaintiff's wrists.  (*Id.* ¶¶ 164–65 (citing

Pl.'s Pl. Dep. Tr. 94; Lobby Video 2:20–2:35; Pl.'s Wenzel Video 1:38–2:01).)  Larrier and

Wenzel then "smashed [Plaintiff] against the wall," which caused Plaintiff's glasses to cut his

"right orbital bone" and fly off.  (*Id.* ¶ 54 (citing Pl.'s Pl. Dep. Tr. 92–96; Pl.'s 50-h Tr. 102; Pl.'s

Wenzel Video 1:39–2:02).)  Plaintiff also disputes that he hit Wenzel, stating instead that Wenzel

and Larrier put both of his hands behind his back.  (*Id.* ¶ 55 (citing Pl.'s Pl. Dep. Tr. 94; Lobby

Video 2:20–2:35).)

According to the Larrier and Wenzel Videos, which are blocked by Plaintiff's body at

various moments, after Larrier informed Plaintiff that he was under arrest, it appears that Larrier

took Plaintiff's left hand behind his back.  (Defs.' Wenzel Video 1:35–1:41.)  Plaintiff then

turned around, stating, "Get your arms off me," as his hand made contact with Wenzel's body

camera.  (*Id.*)[10]  Larrier held at least one of Plaintiff's hands behind his back, as Wenzel

---

[10] Plaintiff testified during his deposition that he was "turning to give [Larrier and
Wenzel his] answer."  (Pl.'s Pl. Dep. Tr. 95.)

attempted to handcuff the other. (Defs.' Larrier Video 2:00–2:10.) From the Lobby Video, Plaintiff, Larrier, and Wenzel then moved toward the wall on the opposite side of the lobby. (Lobby Video 2:20–2:29.) Larrier and Wenzel put Plaintiff against the wall while they handcuffed him. (*Id.*) Although Plaintiff's face does not appear to touch the wall at first, it seems that the side of his face may have made contact with the wall at one point. (*Id.*) As Larrier and Wenzel handcuffed Plaintiff, he made various statements such as, "You fucking pushed me like that," and, "You have no idea the trouble you're in." (Defs.' Larrier Video 2:05–2:25.) Larrier responded, "How dare you," and "Right now, it's go[ing] to be obstruction." (*Id.*) After Plaintiff was handcuffed, Wenzel appeared to momentarily look at his hand. (Defs.' Larrier Video 2:05–2:25.)[11] At this point, Plaintiff was against the wall, and the glasses he was wearing upon entering the building were no longer on. (Defs.' Wenzel Video 2:00–2:05.)

After Plaintiff was handcuffed, Larrier and Wenzel began to escort him out of the building. (Defs.' 56.1 ¶ 59 (citing Defs.' Larrier Dep. Tr. 127).) Plaintiff remarked, "[D]on't [you] push me," and according to Defendants, stumbled and fell down. (*Id.* ¶ 60 (citing Defs.' Wenzel Dep. Tr. 63; Defs.' Larrier Dep. Tr. 127, 131–32; Lobby Video 2:45–2:51).) As Plaintiff fell, Larrier and Wenzel held onto him "in a manifest effort to minimize his impact with the floor." (*Id.* ¶ 61 (citing Lobby Video 2:45–2:51).) However, Plaintiff claims that Larrier and Wenzel were pushing him, and that he lost his balance and fell on his left side, hitting his head on the floor. (Pl.'s 56.1 ¶¶ 60–61 (citing Pl.'s Larrier Dep. Tr. 127–30; Pl.'s Wenzel Video

---

[11] Plaintiff's handcuffs may not have been double-locked, a mechanism that prevents handcuffs from tightening. (Pl.'s 56.1 ¶ 201 (citing Cohen Decl. Ex. 10 ("Pl.'s FitzMaurice Dep. Tr."), at 58–61 (Dkt. No. 67-10)).) However, officers may use their discretion in using this procedure if, for example, someone is "noncompliant." (Pl.'s FitzMaurice Dep. Tr. 58.)

1:55–2:08; Pl.'s 50-h Tr. 135–37, 146).)[12]  Once Plaintiff was on the floor, he repeatedly yelled, "Ow."  (Defs.' Wenzel Video 2:05–2:20.)  He informed Larrier and Wenzel that he "hit his head," to which Larrier replied, "You didn't hit your head, stand up or we'll drag you out. . . . I have everything on police body cameras."  (*Id.*)  According to Defendants, when Larrier told Plaintiff to stand up, Plaintiff did so "under his own power."  (Defs.' 56.1 ¶ 64 (citing Defs.' Larrier Dep. Tr. 133–34; Lobby Video 3:00–3:05).)  Plaintiff disputes this characterization, stating that Larrier and Wenzel instead "began pulling [Plaintiff] up by the handcuff chain while threatening to drag him out."  (Pl.'s 56.1 ¶¶ 64–65 (citing Pl.'s Pl. Dep. Tr. 100–01; Pl.'s 50-h Tr. 136; Pl.'s Wenzel Dep. Tr. 171–74; Pl.'s Wenzel Video 1:38–2:12).)  Plaintiff did not tell Larrier and Wenzel that his shoulder was injured or that he had had surgery on his shoulder.  (Defs.' 56.1 ¶ 65 (citing Defs.' Larrier Video 2:20–2:45; Defs.' Wenzel Video 2:00–2:35).)  After Plaintiff was up, Larrier and Wenzel escorted him to Wenzel's vehicle.  (Pl.'s 56.1 ¶ 66 (citing Pl.'s Wenzel Video 2:29–2:35).)  On the way to the car, Plaintiff's hands were behind his back, and Larrier was standing directly behind Plaintiff holding the handcuff chain.  (*Id.* ¶ 72 (Pl.'s Pl. Dep. Tr. 106–12; Pl.'s Wenzel Video 1:35–4:52).)

Larrier and Wenzel told Plaintiff to get inside of Wenzel's car, but Plaintiff initially did not, instead asking repeatedly for his handcuffs to be loosened.  (Defs.' 56.1 ¶ 67 (citing Defs.' Pl. Dep. Tr. 107–12; Defs.' Wenzel Video 2:50–4:00); Pl.'s 56.1 ¶¶ 67, 69, 175 (citing Pl.'s

---

[12] According to Defendants, when reviewing the Lobby Video after the incidents and seeing himself fall to the ground, Plaintiff remarked that he should "win an Academy Award."  (Defs.' 56.1 ¶ 62 (citing Loomba Decl. Ex. L ("Defs.' Dapolite Dep. Tr."), at 21–22, 52 (Dkt. No. 65-12)).)  This alleged statement "came to light" when a WPPD investigator contacted Andrew Dapolite, a videographer hired by Plaintiff, in connection with the case.  (Pl.'s 56.1 ¶ 62 (citing Cohen Decl. Ex. 8 ("Pl.'s Dapolite Dep. Tr."), at 22, 37–38 (Dkt. No. 67-8)).)  Plaintiff does not recall making this statement, but testified that if he did, it would have been a joke.  (Defs.' 56.1 ¶ 63 (citing Defs.' Pl. Dep. Tr. 154).)

Larrier Dep. 144–53; Pl.'s 50-h Tr. 137–38; Pl.'s Wenzel Dep. Tr. 105–06; Pl's Wenzel Video 3:21–3:57, 4:55–7:25; Pl.'s Larrier Video 3:39–4:23; Cohen Decl. Ex. 11 ("Arrest Procedures"), at WP_00286 (Dkt. No. 67-11)).) Larrier did not visually inspect Plaintiff's handcuffs or loosen them at this time, stating, "They are not built for comfort." (*Id.* ¶¶ 67, 69 (citing Pl.'s Larrier Dep. Tr. 144–53; Pl.'s 50-h Tr. 137–38; Pl.'s Wenzel Dep. Tr. 105–06; Pl's Wenzel Video 4:55–7:25; Arrest Procedures WP_00286).)[13] As Plaintiff continued to stand outside of the car, Larrier put his hand on Plaintiff's arm and moved him toward the vehicle door. (Defs.' Larrier Video 4:00–4:10.) As he got into the car, Plaintiff stated, "All I want to let you know is I can hardly hold my wrists," and Wenzel informed Plaintiff that they would remove the handcuffs at WPPD Station. (*Id.* at 4:10–4:20.) As Larrier and Wenzel shut the car door, Plaintiff remarked, "Ow, ow." (*Id.* at 4:20–4:23.) Wenzel stated, "Whatever," and Larrier instructed, "Leave that recording . . . He's obstruction all the way." (*Id.* at 4:23–4:32.) Plaintiff did not tell Larrier and Wenzel on the way to the vehicle that he was bleeding, or that he suffered from Factor VIII deficiency. (Defs.' 56.1 ¶¶ 71–72 (citing Defs.' Larrier Video 0:30–4:20; Defs.' Wenzel Video 0:30–13:44; Pl.'s Pl. Dep. Tr. 107–12).) However, according to Plaintiff, he was bleeding from his wrist and cheek, as well as from injuries to his forearms and shins. (Pl.'s 56.1 ¶ 73 (citing Pl.'s Larrier Dep. Tr. 146–47, 155–67; Pl.'s Larrier Video 3:30–5:05, 6:05–6:11, 6:41–6:50, 27:00–27:50; Pl.'s Wenzel Video 4:33–4:36).)

---

[13] According to Defendants, in order to loosen handcuffs, police officers must first "completely unlock[]" them, (Defs.' 56.1 ¶ 68 (citing Defs.' Wenzel Dep. 22–24, 27–28; Loomba Decl. Ex. M ("Defs.' FitzMaurice Dep. Tr."), at 162 (Dkt. No. 65-13))), but it may be possible to loosen handcuffs without removing them, (Pl.'s 56.1 ¶ 68 (citing Pl.'s Wenzel Dep. Tr. 25–31; Cohen Decl. Ex. 9 ("White Dep. Tr."), at 40–42 (Dkt. No. 67-9); Pl.'s FitzMaurice Dep. Tr. 161–63)).

Once Plaintiff was inside the vehicle, Larrier returned to 33 Barker Avenue to respond to the reported dispute. (Defs.' 56.1 ¶ 75 (citing Defs.' Wenzel Video 4:00–4:10).) Plaintiff notes that immediately after putting Plaintiff in the car, Wenzel looked at his hand, and Larrier looked at his hand at least twice on the way to the building and once in the vestibule. (Pl's 56.1 ¶¶ 180–81, 186 (citing Pl.'s Larrier Video 3:29–4:30, 4:50–5:00; Pl.'s Wenzel Video 3:40).) Larrier also appears to look at his thumb immediately after putting Plaintiff in the police vehicle, because, according to Larrier, his thumb was "throbbing." (Defs.' Larrier Video 3:30–3:32; Pl.'s Larrier Dep. Tr. 155.) At some point, Larrier saw a "smudge [of blood] on his hand." (*Id.*) A man let Larrier into the building, and they rode the elevator together. (Pl.'s 56.1 ¶ 182 (citing Pl.'s Larrier Video 6:05–7:03).) The man asked Larrier if he was injured when he noticed blood on Larrier's hand, and Larrier informed the man that the blood was not his. (*Id.*) Upon arriving to Sanders's apartment, Larrier showed P.O. Fallon ("Fallon") his hand and told her about the arrest. (*Id.* ¶ 183 (citing Pl.'s Larrier Video 8:33–8:55).) Before leaving, Larrier asked Sanders if he could use her bathroom, where he washed the blood off of his hand. (*Id.* ¶ 184 (citing Pl.'s Larrier Video 27:05–27:45).) Larrier did not tell Wenzel or the WPPD dispatcher about the blood. (*Id.* ¶ 185 (citing generally Pl.'s Larrier Video).)

### 3. Plaintiff's Ride to WPPD Station

At 9:05:31 p.m., Plaintiff was seated in the back of Wenzel's police vehicle, and Wenzel radioed WPPD Station that he was returning with one male under arrest. (Defs.' 56.1 ¶ 74 (citing Dispatch Recordings No. 101).) When Plaintiff first sat down in the police car, he noticed that he was bleeding because he felt "blood streaming down [his] hands." (Defs.' Pl. Dep. Tr. 112.)

On the way to WPPD Station, Plaintiff told Wenzel that he was bleeding and asked him to remove the handcuffs and to do something to stop the bleeding. (Defs.' 56.1 ¶ 76 (citing Defs.' Wenzel Dep. Tr. 53–55; Defs.' Wenzel Video 4:00–5:00); Pl's 56.1 ¶ 187 (citing Pl.'s Wenzel Video 4:33–4:35).) Wenzel responded, "I know, we'll get you some medical care in a minute." (Defs.' Wenzel Video 4:30–4:40.) Wenzel testified that he responded, "I know" to acknowledge Plaintiff's statement, even though he had not seen Plaintiff's wrists. (Defs.' Wenzel Dep. Tr. 54.) Plaintiff again asked Wenzel if he could do something to relieve the bleeding, and Wenzel offered to call an ambulance as soon as they arrived at WPPD Station. (Defs.' 56.1 ¶ 83 (citing Defs.' Wenzel Dep. 53–55; Defs.' Wenzel Video 4:30–4:55); Pl.'s 56.1 ¶ 188 (citing Pl.'s Wenzel Video 4:35–4:38); Defs.' Wenzel Video 4:35–4:50.) Plaintiff responded that he did not need an ambulance, and Wenzel said that they would "get [him] some paper towels" instead. (*Id.* at 4:48–4:53.) Plaintiff again replied that he was "just asking to relieve the handcuffs." (*Id.* at 4:51–4:55.) Although difficult to discern, Plaintiff appears to have asked for care or assistance "now." (*Id.* at 4:55–5:00.) Wenzel later testified that he did not take Plaintiff directly to the emergency room because he understood from training and experience that a person would need to be "unconscious [or] non-coherent" to require immediate medical attention. (Defs.' Wenzel Dep. Tr. 63.) During his deposition, Robinson testified that WPPD guidelines instruct that an arrestee complaining of an injury should be taken to the emergency room before going to WPPD Station, but that this is "up to the common sense of the officer." (Loomba Decl. Ex. O ("Defs.' Robinson Dep. Tr."), at 61 (Dkt. No. 65-15).)[14]

---

[14] A document detailing WPPD's arrest procedures states that "prisoners with apparent injuries, complain[ing] of illness or injury . . . will be transported directly to the nearest hospital emergency room for appropriate treatment BEFORE they are brought to either headquarters or Family Court." (Pl.'s 56.1 ¶ 83 (citing Arrest Procedures) (alteration and emphasis in original); Pl.'s Robinson Dep. Tr. 61.)

According to Plaintiff, while he was in the police car, he was seated with his hands still handcuffed behind his back and did not have a seatbelt on, which was contrary to WPPD policy. (Pl.'s 56.1 ¶ 74 (citing Pl.'s 50-h Tr. 149; Pl.'s Wenzel Dep. Tr. 97; Pl.'s Wenzel Video 5:11–5:20; Cohen Decl. Ex. 12 ("Pl.'s Robinson Dep. Tr."), at 45–49 (Dkt. No. 67-12)).)[15]  As a result, Plaintiff fell over on the back seat when Wenzel turned a corner, which Wenzel does not recall, and Wenzel told him to sit up.  (*Id.*)  Plaintiff appears to have stated, "Ow, ow . . . can you help me here?" when he fell over.  (Defs.' Wenzel Video 5:05–5:12.)  During the ride, Wenzel did not check Plaintiff's condition, remove the handcuffs, or take Plaintiff to the hospital.  (Pl.'s 56.1 ¶ 191 (citing Pl.'s Wenzel Video 5:00–6:29).)  Wenzel told Plaintiff that he "would not be in this situation if he [had] . . . listen[ed] to [Wenzel and Larrier]."  (*Id.*)

Just before 9:09 p.m., Plaintiff and Wenzel arrived at WPPD station, where Wenzel pulled into the "sally port," which is a "secure garage area."  (Defs.' 56.1 ¶ 85 (citing Dispatch Recordings No. 105).)  Wenzel put on black gloves before opening the car door for Plaintiff. (Pl.'s 56.1 ¶ 192 (citing Pl.'s Wenzel Video 7:32–7:43).)  When Wenzel opened the door, Plaintiff said that he could not get out of the car because he was "a little dizzy," thought he needed help, and reminded Wenzel that he had hit his head when he fell earlier.  (*Id.* ¶¶ 193–94 (citing Pl.'s Wenzel Video 7:43–8:05, 8:35–8:39); Defs.' 56.1 ¶ 86 (citing Pl.'s Pl. Dep. Tr. 124; Dispatch Recordings No. 107; Defs.' Wenzel Video 7:40–8:10).)  Plaintiff stated, "Get me some medical attention, please."  (Defs.' Wenzel Video 7:58–8:00.)  When Wenzel told Plaintiff he would do so inside, Plaintiff responded, "I don't think I can get up."  (*Id.* at 8:00–8:05.)

---

[15] Robinson testified that this policy is a guideline that can be disregarded if, for example, an arrestee is being combative.  (Pl.'s Robinson Dep. Tr. 45.)

At 9:09:31 p.m., Wenzel used his radio to request an ambulance from the "communications room."  (Defs.' 56.1 ¶ 86 (citing Defs.' Pl. Dep. Tr. 124; Dispatch Recordings No. 107; Defs.' Wenzel Video 7:40–8:10).)  When an officer responded that there were no ambulances available, Wenzel said, "Suspect is complaining of dizziness."  (Pl.'s 56.1 ¶ 86 (citing Pl.'s Wenzel Video 7:40–8:10).)  Wenzel continued to tell Plaintiff to get out of the car, and Plaintiff again told Wenzel that he did not think he could get up because he was "very dizzy" and had "banged [his] head."  (*Id.* ¶ 196 (citing Pl.'s Wenzel Video 8:32–8:39).)  At the time of Wenzel's request, all three ambulances designated to respond to emergency medical requests from WPDD Station were unavailable to respond immediately.  (Defs.' 56.1 ¶ 91 (citing Defs.' Robinson Dep. Tr. 68; Dispatch Recordings No. 107).)  According to Plaintiff, WPPD could have called for a "mutual aid ambulance" at that time, which is a request for an available ambulance from a neighboring jurisdiction.  (Pl.'s 56.1 ¶ 91 (citing Pl.'s Robinson Dep. Tr. 68; Cohen Decl. Ex. 14 ("Pl.'s Formoso Dep. Tr."), at 21 (Dkt. No. 67-14)).)  Robinson testified, however, that he usually finds out more information about an arrestee before calling a mutual aid ambulance because doing so would remove an ambulance from another jurisdiction.  (Pl.'s Robinson Dep. Tr. 69.)

While Wenzel took off his black gloves and retrieved rubber gloves from his car, P.O. Maurice Love ("Love") approached the car and repeatedly told Plaintiff to get out, then helped Plaintiff do so.  (Pl.'s 56.1 ¶ 197 (citing Pl.'s Wenzel Video 8:58–10:10; Pl.'s Wenzel Dep. Tr. 116).)  Love assured Plaintiff that he would "get [him] an ambulance, and said, "We will take care of your medical needs."  (Defs.' Wenzel Video 9:25–9:40.)  Once out of the car, Plaintiff asked for an ambulance "as soon as you can," which Love said they would do.  (*Id.* at 10:10–10:30.)  When Plaintiff asked how much blood there was, Love responded, "Don't worry about

the blood." (Pl.'s 56.1 ¶¶ 96, 198 (citing Pl.'s Pl. Dep. Tr. 106; Pl.'s Larrier Video 3:30–5:05; Pl.'s Wenzel Video 4:33–11:45).) Plaintiff replied that he was worried about the blood. (*Id.* ¶ 198 (citing Pl.'s Wenzel Video 7:20 –11:07).) P.O. Caleb White ("White") was also in the sally port and informed Plaintiff that if he was conscious, he was "alright." (*Id.*) Plaintiff walked into the headquarters, asking for a "minute" and stopping once on the way, stating that he could not go any further. (*Id.*; Defs.' Wenzel Video 10:15–10:55.) Plaintiff then walked the rest of the way into the station. (*Id.* at 10:55–11:20.)

### 4. WPPD Station Incidents

Plaintiff was then brought inside WPPD Station, where, upon arriving, Plaintiff again asked for his handcuffs to be loosened, which Wenzel agreed to do. (*Id.* at 11:18–11:25.) Wenzel removed the handcuffs and put Plaintiff in a chair in front of the booking desk area. (Defs.' 56.1 ¶¶ 92, 97 (citing Defs.' Wenzel Dep. Tr. 118; Defs.' Wenzel Video 10:50–12:30; Loomba Decl. Ex. P ("Defs.' Station Video"), at 1:00–1:25 (Dkt. No. 65-16)); Pl.'s 56.1 ¶ 199 (citing Pl.'s Wenzel Video 11:19–12:32).)[16] Plaintiff's handcuffs were removed for "approximately 20 seconds" until Wenzel re-handcuffed Plaintiff's right hand to a rail in front of the booking desk. (Defs.' 56.1 ¶ 97 (citing Defs.' Wenzel Video 11:45–12:30; Defs.' Station Video 1:00–1:25); Pl.'s 56.1 ¶ 92 (citing Pl.'s Wenzel Video 10:50–12:50); Defs.' Pl. Dep. Tr. 133.) There was visible blood on Plaintiff's suit jacket and hands, and Wenzel used the bloodied handcuffs to cuff one of Plaintiff's wrists to the rail. (Defs.' Wenzel Video 11:30–12:35.)

---

[16] The video footage from WPPD Station ("Station Video") is taken from the Station's surveillance video system and consists of seven camera views: "Booking Desk," "Sally 1," "Metal Detector," "Side Rail," "Jailer," "Sally 2," and "Prison Elevator." (Defs.' 56.1 ¶ 94 (citing Loomba Decl. ¶ 20).) The Parties agree that beyond an inaccurate time stamp, which is several minutes ahead, the Station Video "fairly and accurately depicts the images and events captured on the video recordings." (*Id.*)

According to Defendants, Wenzel noticed blood on Plaintiff's wrists and hands for the first time when he lifted Plaintiff's suit jacket, which Plaintiff disputes. (Defs.' 56.1 ¶ 96 (citing Defs.' Wenzel Dep. Tr. 118; Defs.' Wenzel Video 11:30–11:45; Station Video 0:20–0:30, 4:33–11:45); Pl.'s 56.1 ¶ 96 (citing Pl.'s Pl. Dep. Tr. 106; Pl.'s Larrier Video 3:30–5:05; Pl.'s Wenzel Video 4:33–11:45).) Plaintiff testified that he did not complain about the new handcuff because it had been "loosened." (Defs.' 56.1 ¶ 98 (citing Defs.' Pl. Dep. Tr. 133–34); Pl.'s 56.1 ¶ 98 (citing Pl.'s Pl. Dep. Tr. 135–36; Pl.'s Wenzel Video 10:50–12:50; Station Video 0:09–1:26; Cohen Decl. Ex. 15 ("Station Photos") (Dkt. No. 67-15)).)

Once Plaintiff was handcuffed to the rail, Wenzel entered the communications room and told Officer White about the incidents at 33 Barker Avenue, explaining that he and Larrier had to "put [the handcuffs] on [Plaintiff] as quick[ly] as [they] could." (*Id.* ¶ 200 (citing Pl.'s Wenzel Video 12:33–13:10).) According to Robinson, who was in the communications room at the time, Wenzel told him that Plaintiff was bleeding, but that the blood was not "gushing or spurting," which "dissipated . . . any sense of urgency" for Robinson. (*Id.* ¶ 203 (citing Pl.'s Robinson Dep. Tr. 38–41).) P.O. Jose Formoso ("Formoso"), who was also in the communications room, saw Plaintiff on the monitor and stated, "Who brought this old guy in here[?] He's going to have a fucking heart attack[.]" (*Id.* ¶ 204 (citing Pl.'s Wenzel Video 13:30; Pl.'s Formoso Dep. Tr. 87–88; Pl.'s Robinson Dep. Tr. 75–76).) Another officer asked, "Lieutenant, what are we doing here? Are you fucking kidding me?" (*Id.*) It is not clear whether this officer was referencing Plaintiff. (Pl.'s Robinson Dep. Tr. 79.)

A few minutes later, Robinson walked into the booking room and "observed and spoke directly with [Plaintiff] for about 1.5 minutes." (Defs.' 56.1 ¶ 99 (citing Station Video 3:15–4:45).) According to Robinson's observations as a trained and certified Emergency Medical

Technician ("EMT"), Plaintiff was not in "immediate medical distress," which Plaintiff disputes. (*Id.* ¶ 100 (citing Robinson Dep. Tr. 55–56, 59); Pl.'s 56.1 ¶ 100 (citing Pl.'s Wenzel Video 13:35–13:43).)  Robinson noted that Plaintiff had "abrasions" on his wrists that were not bleeding excessively and were instead beginning to clot, but Plaintiff avers that "a significant amount" blood was still "coming from every place that [he] was bleeding" at the time, particularly his wrists.  (Defs.' 56.1 ¶ 101 (Defs.' Robinson Dep. Tr. 41, 59–60); Pl.'s 56.1 ¶ 101 (citing Pl.'s Pl. Dep. Tr. 135–36; Cohen Decl. Ex. 13 ("Pl.'s Thakur Dep. Tr."), at 55 (Dkt. No. 67-13)).)[17]  Robinson also noted a cut on Plaintiff's face and dried blood around it, but determined that Plaintiff was "alert, oriented[,] and sitting comfortably."  (*Id.* ¶ 206 (citing Pl.'s Robinson Dep. Tr. 56–60, 71–75).)  "Based on his EMT training," Robinson thought that the best treatment for Plaintiff would be to leave the wounds alone and let them clot on their own until an ambulance arrived.  (Defs.' 56.1 ¶ 102 (citing Defs.' Robinson Dep. Tr. 24–25, 41, 59–61).)[18]  Robinson's "general impression" was that Plaintiff had caused his injuries by "manipulat[ing] the handcuffs . . . [and] cheese grat[ing] his wrists" to cause the injuries.  (Defs.' Robinson Dep. Tr. 41–42.)  Robinson informed Plaintiff that an ambulance would arrive as soon as it was available and then returned to the communications room.  (Defs.' 56.1 ¶¶ 103–04

---

[17] According to Robinson, an abrasion is a scrape, and a laceration is a cut.  (Pl.'s Robinson Dep. Tr. 56.)

[18] Dr. Keyur Thakur ("Dr. Thakur"), a hematologist, was shown photographs of Plaintiff's wrists while he was being re-handcuffed at WPPD Station, and Dr. Thakur noticed blood on Wenzel's gloved hand.  (Pl.'s 56.1 ¶¶ 242–43 (citing Pl.'s Thakur Dep. Tr. 50–51; Station Photos).)  Due to the blood on the gloves, which Dr. Thakur stated looked like a "liquidus stain" as opposed to a "dried powder," he assumed that Plaintiff was still actively bleeding at this point, as a wound that had started to clot would not transfer blood upon contact. (*Id.* ¶¶ 244–47 (citing Pl.'s Thakur Dep. Tr. 51–55).)  Dr. Thakur stated that Plaintiff's wounds should have been wrapped to prevent "further ongoing blood loss."  (*Id.* ¶ 245 (citing Pl.'s Thakur Dep. Tr. 53–54).)

(citing Defs.' Robinson Dep. Tr. 19–20, 59–60, 73–74; Station Video 4:30–4:45).) Robinson recalled Plaintiff "becoming more demanding" about getting an ambulance, and, according to Robinson, he told Plaintiff "several times" that an ambulance would come when it was available, that "he was fine," and that there were "no issues with him." (Pl.'s 56.1 ¶ 213 (citing Pl.'s Robinson Dep. Tr. 63–69); Defs.' Robinson Dep. Tr. 74.) Robinson testified that he thought it was fine to keep Plaintiff handcuffed at this time because the handcuff "would not have been in the same spot" as Plaintiff's previous injuries. (Pl.'s Robinson Dep. Tr. 60–61.) Robinson also testified that Plaintiff "was always going to get an ambulance," but it was "a question of what the urgency was" and whether Robinson "needed to get one immediately." (Id. at 73.)

A few minutes later, Wenzel and Robinson returned to the booking room with a couple of other officers, and Robinson watched as Wenzel searched Plaintiff. (Pl.'s 56.1 ¶ 207 (citing Station Video 7:20–9:00).) When Plaintiff stood up, he said that he needed help because he was dizzy and nauseous from hitting his head. (Id. ¶ 208 (citing Station Video 7:20–9:00; Pl.'s 50-h Tr. 127).) Robinson responded, "There's nothing fucking wrong with you, you're standing up." (Id.) After the search, Robinson returned to the communications room and Wenzel began to inventory Plaintiff's property. (Id. ¶ 209 (citing Station Video 9:00–13:10).) During this period, Plaintiff sat in the chair, and appeared to be slumped over. (Station Video 9:00–13:10.) Approximately eight minutes later, Plaintiff tried to stand up, but fell down. (Pl.'s 56.1 ¶ 210 (citing Pl.'s 50-h Tr. 127–28; Pl.'s Pl. Dep. Tr. 136–37; Station Video 13:10–14:50).) When Robinson saw this occur from the communications room, he decided to call for a mutual aid ambulance, because his "biggest concern was [Plaintiff] was going to hurt himself . . . in [WPPD] custody." (Defs.' 56.1 ¶ 109 (citing Defs.' Robinson Dep. Tr. 79–81); Pl.'s 56.1 ¶ 215 (citing Pl.'s Robinson Dep. Tr. 79–81).) Plaintiff recalled that he was feeling dizzy and

nauseous at this time, and also that he may have "slid off the chair," (*id.* ¶ 108 (citing Pl.'s Pl. Dep. Tr. 136); Pl.'s Pl. Dep. Tr. 137), while Robinson testified that Plaintiff threw himself off of the chair, (Defs.' Robinson Dep. Tr. 79–80).

At 9:25:29 p.m., the communications room called to request a mutual aid ambulance. (Defs.' 56.1 ¶ 110 (citing Dispatch Recordings No. 137).)  Robinson and Wenzel returned to the booking area, and Wenzel helped Plaintiff back into his chair.  (*Id.* ¶ 111 (citing Station Video 13).)  At approximately 9:26:59 p.m., one of the three White Plains ambulances came back on service; this ambulance was directed to respond to WPPD Station at 9:27:20 p.m., and the call for mutual aid was cancelled at 9:27:25 p.m.  (*Id.* ¶¶ 112–13 (citing Dispatch Recordings Nos. 141–43; Defs.' Robinson Dep. Tr. 81).)  The ambulance arrived at WPPD Station at approximately 9:30:55 p.m., and the ambulance crew was by Plaintiff's side at approximately 9:32 p.m.  (*Id.* ¶¶ 114–15 (citing Dispatch Recordings No. 154; Defs.' Robinson Dep. Tr. 81–82; Defs.' Pl. Dep. Tr. 131–33; Loomba Decl. Ex. Q ("Defs.' Perlera Dep. Tr."), at 13 (Dkt. No. 65-17)).)  When Larrier returned to WPPD Station later that evening, Robinson asked him "how [Plaintiff] had gotten so bloody," to which Larrier responded that he "ha[d] no idea."  (Pl.'s Larrier Dep. Tr. 165.)

### 5.  Plaintiff's Treatment

When the EMTs arrived, Plaintiff was "sitting slumped over," and he complained of dizziness, bleeding, and pain.  (Pl.'s 56.1 ¶ 217 (citing Cohen Ex. 16 ("Pl.'s Loria Dep. Tr."), at 32–35, 63–66 (Dkt. No. 67-16); Pl.'s Perlera Dep. Tr. 33–40).)  The ambulance crew determined that Plaintiff was not in critical condition and that he needed basic life support procedures, which require an EMT, and not advanced life support procedures, which require a paramedic.  (Defs.' 56.1 ¶ 116 (citing Defs.' Perlera Dep. 11–12, 51–52; Loomba Decl. Ex. R ("Defs.' Loria Dep.

Tr."), at 9, 12, 14–16, 59 (Dkt. No. 65-18)); Pl.'s 56.1 ¶ 116 (citing Pl.'s Loria Dep. Tr. 9, 12,

14–16, 59); Defs.' Perlera Dep. Tr. 12.) According to Defendants, the ambulance crew noted

only dried blood on Plaintiff, and did not need to implement "active bleeding control measures,"

which Plaintiff disputes. (Defs.' 56.1 ¶¶ 117–18 (citing Defs.' Perlera Dep. Tr. 23–25, 33–34,

49–50); Pl.'s 56.1 ¶¶ 117–18 (citing Pl.'s Pl. Dep. 135–36; Pl.'s Thakur Dep. 55).) According

to ambulance crew member Manuel Perlera ("Perlera"), Plaintiff told the ambulance crew that he

had "[t]ried to take the handcuffs off[,] and instead of taking them off he got some lacerations,"

but Plaintiff also disputes making this statement. (Defs.' 56.1 ¶ 119 (citing Defs.' Perlera Dep.

Tr. 17–18, 20–21; Defs.' Robinson Dep. Tr. 41–42); Pl.'s 56.1 ¶ 119 (citing Pl.'s Pl. Dep. Tr.

121).)[19] Perlera's notes also read that Plaintiff "[c]omplained of dizziness and laceration to both

wrists and small laceration on the face . . . one located on the right side of the forehead[,] and the

second one . . . on the right side of his cheek." (Defs.' Perlera Dep. Tr. 17.) Perlera also wrote

that Plaintiff "state[d] that he was thrown on the floor by the officers." (*Id.* at 18.)

At approximately 9:50 p.m., the ambulance took Plaintiff to White Plains Hospital

without incident. (Defs.' 56.1 ¶ 120 (citing Defs.' Perlera Dep. Tr. 20); Pl.'s 56.1 ¶ 218 (citing

Station Video 29:05–29:12).) According to Perlera, the delay at WPPD Station was likely

because the ambulance crew was waiting for paperwork from the police, which Loria confirmed.

(*Id.* ¶¶ 219–20 (citing Pl.'s Perlera Dep. Tr. 44–45; Pl.'s Loria Dep. Tr. 50–53).) According to

Robinson, WPPD was not responsible for any delay, and the EMTs were doing "patient

---

[19] Plaintiff specifically notes that Perlera testified that he had "no independent memory" of treating Plaintiff, and thought that someone at the police station probably filled him in on what happened when he arrived. (Pl.'s 56.1 ¶ 119 (citing Pl.'s Perlera Dep. Tr. 10, 39).) Benito Loria ("Loria"), also on the ambulance crew, testified that to generate a patient care report, crew members handwrite their notes when they are with the patient, then enter them into a tablet at the hospital when they finish their shift, shredding the original notes afterward. (*Id.* (citing Pl.'s Loria Dep. Tr. 27–29).)

assessment" before the departure. (*Id.* ¶ 221 (citing Pl.'s Robinson Dep. Tr. 81–86).) Pursuant to orders from Robinson, Plaintiff was shackled and handcuffed before getting into the ambulance. (*Id.* ¶¶ 120, 222 (citing Pl.'s Wenzel Dep. Tr. 151–52, 157–58; Pl.'s Robinson Dep. Tr. 86–88; Pl.'s Pl. Dep. Tr. 140).) Robinson ordered these measures because he was "concerned about [Plaintiff] being a danger to police officers or the ambulance crew," due to the information he received from Wenzel about Plaintiff's conduct during the arrest. (*Id.* ¶ 222 (citing Pl.'s Wenzel Dep. Tr. 151–152, 157; Robinson Dep. Tr. 86–88; Pl.'s Pl. Dep. Tr. 140).) Wenzel and Fallon were ordered to go to the hospital with Plaintiff, and they drove together in a patrol car. (*Id.* ¶¶ 223–24 (citing Pl.'s Robinson Dep. Tr. 86–90; Pl.'s Wenzel Dep. Tr. 151).) According to Robinson, they "probably should have" gone in the ambulance with Plaintiff because that is a "good practice" that is imparted during training. (Pl.'s Robinson Dep. Tr. 88–89.) The drive to White Plains Hospital took approximately two to three minutes. (Defs.' Perlera Dep. Tr. 12.)

At the hospital, Plaintiff's wounds were cleaned, bandaged, and photographed, but he refused further medical attention of the length of time it took to be seen. (Defs.' 56.1 ¶ 121 (citing Defs.' Pl. Dep. Tr. 141–42; Defs.' 50-h Tr. 47–48); Pl.'s 56.1 ¶¶ 121, 227 (citing Pl.'s Pl. Dep. Tr. 141–43; Cohen Decl. Ex. 22 ("Hospital Photos") (Dkt. No. 67-22)).) Due to the wait, Plaintiff did not consent to having an MRI at the hospital. (Defs.' Pl. Dep. Tr. 142.)

Several hours later, Plaintiff was returned to WPPD Station, and was initially re-handcuffed to the booking rail until Booking Officer David Camacho ("Camacho") fingerprinted and photographed him, at which point the handcuffs and shackles were removed. (Defs.' 56.1 ¶ 122 (citing Defs.' Pl. Dep. Tr. 144); Pl.'s 56.1 ¶¶ 122, 229 (citing Pl.'s Pl. Dep. Tr. 144; Pl.'s Wenzel Dep. Tr. 163–68; Cohen Decl. Ex. 23 ("Pl.'s Camacho Dep. Tr."), at 32–43 (Dkt. No.

67-23)).) Plaintiff posted bail of $500, was given a "desk appearance ticket," and was released at approximately 3:09 a.m. (Defs.' 56.1 ¶ 123 (citing Loomba Decl. Ex. S ("Defs.' Camacho Dep. Tr."), at 33–35 (Dkt. No. 65-19); Defs.' Pl. Dep. Tr. 144); Pl.'s 56.1 ¶ 228 (citing Pl.'s Robinson Dep. Tr. 94–95).) Plaintiff walked to 33 Barker Avenue to retrieve his car and drove home. (Defs.' 56.1 ¶ 124 (citing Defs.' Pl. Dep. Tr. 145).)

### 6. Plaintiff's Subsequent Medical Treatment

The following day, January 26, 2017, Plaintiff saw Dr. Shemeela Chorny ("Dr. Chorny"), his primary care provider. (Pl.'s 56.1 ¶ 235 (citing Medical Records 5–7).) Dr. Chorny noted "multiple lacerations" on Plaintiff's wrist, arms, and legs, a "1.5 inch scratch" on his face, "open wounds" on his arms and legs, and wrist wounds that were still bleeding. (*Id.* ¶¶ 236–37 (citing Medical Records 5–7; Chorny Dep. Tr. 91).) Dr. Chorny recommended that Plaintiff undergo a CT scan to rule out bleeding in his brain, which Plaintiff did on the same day. (*Id.* ¶¶ 238–39 (citing Medical Records 5–7, 29).) According to Dr. Chorny, Plaintiff's wrist wounds would have been painful, and someone with Plaintiff's skin condition would "bruise or bleed or have skin breaks with less force than someone who didn't [have the condition]." (*Id.* ¶ 241 (citing Chorny Dep. Tr. 90–91).)

On January 30, 2017, Plaintiff saw Dr. John Robbins ("Dr. Robbins"), his neurologist. Robbins noted "visible body contusions throughout [Plaintiff's] arms," and determined that the incidents had "exacerbated [Plaintiff's] lumbar stenosis and cervical strain." (*Id.* ¶ 249 (citing Medical Records 11; Robbins Dep. Tr. 58).) Dr. Robbins could not say for sure that the contusions were from the handcuffs. (Robbins Dep. Tr. 57.) He stated that Plaintiff was to remain disabled from work until his next exam. (Pl.'s 56.1 ¶ 249 (citing Medical Records 11; Robbins Dep. Tr. 57).)

On March 20, 2017, Plaintiff saw orthopedist Dr. Eric Spencer ("Dr. Spencer"), who noted that Plaintiff had a "right knee sprain, bilateral shoulder sprains, [and] very likely bilateral new rotator cuff tears" as a result of the incidents. (*Id.* ¶ 253 (alteration in original) (citing Medical Records 12–13).) A week later, Plaintiff again saw Dr. Robbins, who noted that Plaintiff's "right knee medial meniscus tear" had been "exacerbated with current injury," and that Plaintiff suffered from "new assault-related left rotator cuff derangement." (*Id.* ¶ 250 (citing Medical Records 10).) Dr. Robbins also requested an updated MRI, which Plaintiff had on April 11, 2017. (*Id.* ¶¶ 250–51 (citing Medical Records 9–10).) On May 3, 2017, Dr. Robbins discussed the MRI with Plaintiff, noting that it showed swelling in his spine "as a direct result of the trauma he sustained on January 25, 2017." (*Id.* ¶ 251 (citing Medical Records 9).) On June 15, 2017, Plaintiff told Dr. Robbins that he was doing only "20% of his normal activity," and Dr. Robbins suggested that Plaintiff take a medical leave of absence. (*Id.* ¶ 252 (citing Medical Records 8; Robbins Dep. Tr. 73).)

On September 28, 2017, Plaintiff saw a pain management specialist, Dr. Jozef Debiec ("Dr. Debiec"), due to "ongoing pain from the injuries . . . [from] the night of the incident[s]." (*Id.* ¶ 256 (citing Medical Records 2–3).) Dr. Debiec noted that Plaintiff suffered from "increasing pain" in his shoulders, neck, and lower back that began after the January 25, 2017 altercation, and that Plaintiff had pain "100% of the time," the pain "improved with nothing," was "sharp and stabbing," and was "worsened by any activity." (*Id.* ¶ 257 (citing Medical Records 2–3).) Plaintiff rated his pain as a ten out of ten. (Medical Records 2.) Plaintiff also testified that he began taking oxycodone for the pain. (Pl.'s Pl. Dep. Tr. 10.)

In October 2017, Plaintiff underwent arthroscopic surgery on his right shoulder. (Pl.'s 56.1 ¶ 254.) Although Dr. Spencer had recommended "total shoulder replacements," Plaintiff

was not a viable candidate for the surgeries because of his "ongoing medical conditions." (Pl.'s 56.1 ¶ 255 (citing Medical Records 31).) Dr. Spencer further noted that Plaintiff continued to complain of symptoms that "may be consistent with carpal tunnel syndrome," and stated that Plaintiff had "reiterate[d] that [Plaintiff] never had those symptoms before the injury with a police officer[,] and it may be from the tight compression of the handcuffs." (Medical Records 20.) Dr. Spencer later testified that Plaintiff told him he had "neurologic symptoms in his hands after he was handcuffed." (Spencer Dep. Tr. 42.) Approximately a year after the incidents, on January 16, 2018, Dr. Robbins noted that Plaintiff suffered from "[p]rogressive numbness in both upper extremities secondary to progressive carpal tunnel syndrome," and instructed that Plaintiff should "avoid hyperflexion of the wrists . . . [and] use wrist splints at bedtime." (Medical Records 19.)

On June 29, 2018, Plaintiff had an MRI of his brain, which found a "small region of cystic encephalomalacia involving the left lateral frontal lobe possibly related to old infarct or trauma," which both Dr. Chorny and Dr. Carniciu testified would not have been detected by a CT scan. (Pl.'s 56.1 ¶¶ 258–59 (citing Medical Records 21–22; Chorny Dep. Tr. 95; Cohen Decl. Ex. 24 ("Carniciu Dep. Tr."), at 96–97 (Dkt. No. 67-24)).)[20] After viewing body camera footage from Wenzel, Dr. Carniciu testified that it was possible that Plaintiff's left lateral frontal lobe touched the ground when he fell down, and that when Plaintiff's arms were pulled back, it could have "aggravated [Plaintiff's] neck condition." (*Id.* ¶¶ 261–62 (citing Carniciu Dep. Tr. 89–91).)

---

[20] While Plaintiff claims in his 56.1 Statement that his MRI took place on June 9, 2018, (Pl.'s 56.1 ¶ 258), the records from the MRI appear to suggest that the MRI was performed on June 29, 2018, (Medical Records 21).

Eventually, Plaintiff was diagnosed with myelopathy, which affects the spinal cord and can result in balance issues and motor loss. (*Id.* ¶ 263 (citing Medical Records 15–19, 23; Robbins Dep. Tr. 110–11); Robbins Dep. Tr. 110.) Dr. Robbins testified that when Plaintiff first saw him before the incidents, "he had none of the[] symptoms of myelopathy," and thought that the condition had been "clearly aggravated by the altercation." (Pl.'s 56.1 ¶ 264 (citing Robbins Dep. Tr. 113); Robbins Dep. Tr. 113; Medical Records 23.) Plaintiff continued to attend doctor's appointments through at least May 2019. (*See id.* at 32.) On May 9, 2019, Dr. Robbins noted that Plaintiff suffered from "progressive falling, which resulted [from] the altercation with the . . . police officers." (*Id.* at 30.)

Plaintiff currently suffers from post-traumatic stress disorder ("PTSD") as a result of the incidents and continues to suffer from the "effects of the incident[s]," including "pain, difficulty with ambulation, balance issues[,] and falling." (Pl.'s 56.1 ¶¶ 267, 268 (citing Cohen Decl. Ex. 26 ("Sullivan Dep. Tr."), at 182 (Dkt. No. 67-26); Medical Records 32).) Sanders, who was engaged to Plaintiff as of January 25, 2017, testified that Plaintiff is "always in pain" and "can't do anything . . . can't . . . drive[,] . . . help [her] at home . . . he can't do nothing." (Pl.'s Sanders Dep. Tr. 69.)

B. Procedural Background

On April 18, 2017, Plaintiff served a notice of claim on White Plains. (Defs.' 56.1 ¶ 125 (citing Loomba Decl. Ex. T ("Not. of Claim") (Dkt. No. 65-20).) On June 16, 2017, Plaintiff gave sworn testimony in an examination held pursuant to Section 50-h of the New York General Municipal Law. (*Id.* ¶ 126 (citing Defs.' 50-h Tr.).)

On August 15, 2017, Plaintiff filed his Complaint in the instant Action. (Dkt. No. 1.) On January 9, 2018, the Action was assigned to Magistrate Judge Lisa M. Smith ("Judge Smith") for

general pre-trial matters.  (Dkt. Nos. 21–22.)  After receiving leave from the Court at a pre-motion conference held on January 8, 2018, Plaintiff filed an Amended Complaint on January 22, 2018.  (Dkt. (minute entry for Jan. 8, 2018); Dkt. No. 24.)  On January 31, 2018, Judge Smith set a discovery schedule, and a protective order was adopted.  (Dkt. (minute entry for Jan. 31, 2018); Dkt. No. 27.)  On February 5, 2018, Defendants filed an Answer.  (Dkt. No. 28.)

After several discovery extensions, the Court held a Pre-Motion Conference on February 27, 2019.  (Dkt. (minute entry for Feb. 26, 2019).)  Pursuant to the schedule set by the Court, Defendants filed the instant Motion on April 5, 2019.  (*See* Not. of Mot.; Defs.' 56.1; Loomba Decl.; Defs.' Mem. of Law in Supp. of Mot. ("Defs.' Mem.") (Dkt. No. 66).)  On May 24, 2019, Plaintiff filed his Opposition.  (Pl.'s Mem. of Law in Opp'n to Mot. ("Pl.'s Mem.") (Dkt. No. 69); Pl.'s 56.1; Cohen Decl.)  On June 21, 2019, Defendants filed their Reply.  (Defs.' Reply Mem. of Law in Supp. of Mot. ("Defs.' Reply"); Reply Aff'n of Lalit K. Loomba, Esq. ("Loomba Reply Aff'n") (Dkt. Nos. 70–71).)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  "It is the

movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . ."). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental*

*Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted).  At this stage, "[t]he role

of the court is not to resolve disputed issues of fact but to assess whether there are any factual

issues to be tried."  *Brod*, 653 F.3d at 164 (quotation marks omitted).  Thus, a court's goal should

be "to isolate and dispose of factually unsupported claims."  *Geneva Pharm. Tech. Corp. v. Barr

Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quotation marks omitted) (quoting *Celotex Corp. v.

Catrett*, 477 U.S. 317, 323–24 (1986)).  However, a court should consider only evidence that

would be admissible at trial.  *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,* 164 F.3d

736, 746 (2d Cir. 1998).  "[W]here a party relies on affidavits . . . to establish facts, the

statements 'must be made on personal knowledge, set out facts that would be admissible in

evidence, and show that the affiant . . . is competent to testify on the matters stated.'"  *DiStiso v.

Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

B.  Analysis

1.  Excessive Force and Failure to Intervene Claims

Defendants argue that the Court should grant summary judgment with respect to

Plaintiff's excessive force claims against Larrier and Wenzel because excessive force was not

used when these Defendants initially took Plaintiff into custody.  (Defs.' Mem. 11–14.)  With

respect to the excessive force and failure to intervene claims against Robinson, Defendants argue

that summary judgment is warranted because Robinson was not present during Plaintiff's arrest,

and no incidents of excessive force occurred at WPPD Station.  (*Id.* at 14–15, 19.)

a.  Applicable Law

"Claims that law enforcement officers have used excessive force in the course of an

arrest, investigatory stop, or other seizure of a free citizen [are] analyzed under the Fourth

Amendment and its reasonableness standard."  *Usavage v. Port Auth. of N.Y. & N.J.*, 932 F.

Supp. 2d 575, 591 (S.D.N.Y. 2013) (citation, alteration, and quotation marks omitted). "[T]he reasonableness question is whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Mickle v. Morin*, 297 F.3d 114, 120 (2d Cir. 2002) (citation omitted). Accordingly, "courts should examine whether the use of force is objectively unreasonable in light of the facts and circumstances confronting them." *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006) (citation and quotation marks omitted). "Generally, the force used by the [d]efendant must be more than de minimis in order for an excessive force claim to be actionable." *Musso v. City of New York*, No. 05-CV-2511, 2008 WL 3200208, at *4 (E.D.N.Y. July 24, 2008) (citation, italics, alteration, and quotation marks omitted).

Further, "[a] law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers." *Harris v. City of Newburgh*, No. 16-CV-2731, 2017 WL 4334141, at *9 (S.D.N.Y. Sept. 27, 2017) (quoting *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988)). "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (citation omitted).

### b. Defendants Larrier and Wenzel

Plaintiff alleges three categories of conduct by Larrier and Wenzel that could arguably constitute excessive force: (1) the force used when Plaintiff was initially handcuffed; (2) the force used when Plaintiff was allegedly pushed to the lobby floor; and (3) the excessively tight handcuffing of Plaintiff. (Pl.'s Mem. 11–13.) The Court addresses each of these categories in

turn.  *See Dunkelberger v. Dunkelberger*, No. 14-CV-3877, 2015 WL 5730605, at \*14–17

(S.D.N.Y. Sept. 30, 2015) (addressing separately the plaintiff's allegations of tight handcuffing,

threats of arrest and property destruction, brandishing weapons, and physical force); *Keeney v.*

*City of New London*, 196 F. Supp. 2d 190, 198 (D. Conn. 2002) (addressing separately alleged

force used before an individual was handcuffed and restrained and after an individual was

handcuffed and restrained).

### i.  Initial Arrest

Defendants argue that the Lobby Video and Larrier and Wenzel Videos demonstrate

beyond dispute that excessive force was not used by Larrier and Wenzel when they initially

arrested Plaintiff.  (Defs.' Mem. 11–12.)  The Court agrees.

Prior to Plaintiff's arrest, Larrier repeatedly told Plaintiff that he could not come upstairs

and asked that Plaintiff step back, sit down, and wait for more information.  (Defs.' Wenzel

Video 00:30–1:40.)  Instead of complying, Plaintiff informed Larrier and Wenzel that they

would have to arrest him and repeatedly refused to following Larrier's instructions, telling him,

"I'm going up," despite Larrier's instructions to the contrary.  (*Id.*)  Each time that Plaintiff

approached, Larrier held out his forearm to stop him and, at one point, gently pushed Plaintiff

back into the lobby.  (Defs.' Larrier Video 1:00–2:00.)  Despite Plaintiff's allegations that

Larrier "tried to push" him and "put[] his hands on [Plaintiff]," (Pl.'s 56.1 ¶ 52), it is indisputable

that at this point, Larrier used minimal, if any, force.  For example, Plaintiff did not stumble or

fall backward.  (Defs.' Larrier Video 1:00–2:00.)  In the moments before Plaintiff was placed

under arrest, Plaintiff indisputably stepped into the elevator, continuing to tell Larrier that he was

going upstairs and urging Larrier to arrest him.  (Defs.' Wenzel Video 1:20–1:40.)

The facts asserted by Plaintiff regarding his initial arrest are belied by the video footage. Plaintiff alleges that he "did not physically struggle" with the police officers, that he was "pushed" by the officers, and that when he "turned his body while attempting to speak to them," they "forcefully pulled his arm behind him and smashed him against the wall." (Pl.'s 56.1 ¶ 54.) As is clear from the videos, however, at the moment when Larrier attempted to handcuff Plaintiff, Larrier stated, without screaming, "That's fine. Put your hands behind your back." (Defs.' Wenzel Video 1:35–1:43.) As Larrier took one of Plaintiff's hands and began to put it behind his back, Plaintiff quickly turned, stating, "Get your arm off me," an action and statement reasonably interpreted as resisting arrest. (*Id.*)[21] A struggle ensued, and Larrier and Wenzel stationed themselves on either side of Plaintiff and moved him toward the lobby wall. (Lobby Video 2:20 –2:27.) Although Plaintiff claims he was "smashed" against the wall, (Pl.'s 56.1 ¶ 54), the Lobby Video shows that Larrier and Wenzel were not as violent and, although the movement is difficult to see, there is no sound of Plaintiff's body hitting the wall with force, and Plaintiff makes no sounds suggestive of pain, other than his statement, "Stop pushing me." (Lobby Video 2:20–2:45; Defs.' Larrier Video 2:00–2:25.) Larrier and Wenzel placed Plaintiff against the wall, and each took one of his wrists to handcuff him, while Plaintiff attempted to pull at least one arm away. (Lobby Video 2:20–2:45.) At first, Plaintiff's face does not make contact with the wall, but as the officers attempted to handcuff him, they moved to the left, at which point Plaintiff's face does appear to touch the wall. (*Id.* at 2:28–2:35.) However, force imposed by Wenzel and Larrier does not appear to have caused this to occur as both of their hands are on Plaintiff's lower back, and not his head. (*Id.* at 2:20–2:45.)

---

[21] The Court also notes that as Plaintiff turned, his hand hit Wenzel's body camera. (Defs.' Wenzel Video 1:38–1:41.) It is difficult to tell from any of the video angles whether this action was intentional. As such, the Court does not consider this action to be dispositive.

Although Plaintiff's and Defendants' descriptions of this portion of the evening diverge significantly, "[i]ncontrovertible evidence relied on by the moving party, such as a relevant videotape whose accuracy is unchallenged, should be credited by the court . . . if it so utterly discredits the opposing party's version [such] that no reasonable juror could fail to believe the version advanced by the moving party." *Zellner v. Summerlin*, 494 F. 3d 344, 371 (2d Cir. 2007) (citation omitted); *see also Scott v. Harris*, 550 U.S. at 380–81 (same). The Court finds that no reasonable juror could conclude that Plaintiff was not, at least initially, resisting arrest, as implied by his actions and statement, "Get your arm off me," when Larrier tried to handcuff him, and no reasonable juror could conclude that the force used by Larrier and Wenzel to overcome Plaintiff's resistance was unreasonable. Indeed, "[p]hysical force is often necessary when effectuating arrests or executing search warrants," *Genovese v. Town of Southampton*, 921 F. Supp. 2d 8, 20 (E.D.N.Y. 2013), and the analysis of whether force is unreasonable includes, inter alia, "whether [the suspect] is actively resisting arrest," *Sullivan v. Gagnier*, 225 F.3d 161, 165 (2d Cir. 2000) (citations omitted); *see Benitez v. Healy*, No. 15-CV-1179, 2017 WL 9673721, at *7 (S.D.N.Y. June 7, 2017) (finding that although it was clear from the video that the defendants used "some measure of force," there was no evidence that the defendants used the type of excessive force described by the plaintiff), *adopted by* 2018 WL 1444218 (N.D.N.Y. Mar. 22, 2018); *Lin v. City of New York*, No. 14-CV-9994, 2016 WL 7439362, at *11 (S.D.N.Y. Dec. 21, 2016) (finding from video evidence that a handcuffing "proceeded routinely," as the officers used "a reasonable and unremarkable amount of force as they firmly but nonviolently maneuvered [the plaintiff's] hands behind her back"); *Kalfus v. N.Y. and Presbyterian Hosp.*, 706 F. Supp. 2d 458, 472–73 (S.D.N.Y. 2010) (finding that the video of the arrest showed that the plaintiff was "clearly resisting" as he refused to stand and "clearly pushed back with his

weight" when officers put him face down on a concrete slab to handcuff him and, thus, the officers used "only objectively reasonable force under the circumstances"), *aff'd*, 476 F. App'x 877 (2d Cir. 2012); *cf. Crawford v. City of New London*, No. 11-CV-1371, 2014 WL 186417, at *5–6 (D. Conn. Jan. 16, 2014) (finding that a video was not determinative when, among other issues, there was no audio, and thus it was impossible to tell whether the plaintiff had been verbally confrontational).

Further, the injuries alleged by Plaintiff from this portion of the evening are de minimis, as he states that he suffered a cut to his right cheek when his glasses "flew" off of his face. (Pl.'s 56.1 ¶ 167; *see also* Medical Records 5 (noting, on the day after the incidents, a one-and-a-half-inch scratch on the right side of Plaintiff's face).) *See Lemmo v. McKoy*, No. 08-CV-4264, 2011 WL 843974, at *5 (E.D.N.Y. Mar. 8, 2011) ("Injuries held to be de minimis for purposes of defeating excessive force claims include short-term pain, swelling, and bruising . . . ." (citations omitted)); *Johnson v. Police Officer # 17969*, No. 99-CV-3964, 2000 WL 1877090, at *4–5 (S.D.N.Y. Dec. 27, 2000) (dismissing excessive force claim based on the fact that the plaintiff resisted arrest and alleged only minor injuries, including a bruise, a "knot" on his face, and a leg injury (record citation omitted)), *aff'd*, 19 F. App'x 16 (2d Cir. 2001). Although "courts have allowed plaintiffs to recover," even with non-severe injuries, "where the force used was excessive," *Lemmo*, 2011 WL 843974, at *6, the force here was reasonable in light of the fact that Plaintiff repeatedly refused to follow instructions from Larrier and Wenzel and, at least initially, verbally and physically resisted handcuffing. Thus, the Court grants Defendants' Motion as it pertains to the force applied during Plaintiff's initial arrest.

## ii. Alleged Push

According to Plaintiff, once he was handcuffed, Wenzel and Larrier began to "forcefully push[]" him toward the door, at which point he lost his balance and fell and hit his head. (Pl.'s 56.1 ¶¶ 61, 168–69.) Although Plaintiff informed Larrier and Wenzel that he had hit his head, they denied that this occurred, told him that they would drag him out if he did not get up, and pulled him into a standing position by his arms. (Id. ¶¶ 169–71.) According to Defendants, however, Plaintiff was not pushed, and he instead "stumbled" and fell to the floor, as Larrier and Wenzel "continued to hold him . . . to minimize his impact with the floor." (Defs.' 56.1 ¶¶ 60–61.)

Plaintiff's and Defendants' stories are inherently in dispute, and the Court finds that unlike the initial moment of arrest, the video evidence is not so "blatant[ly] contradict[ory]" that "no reasonable jur[or] could believe" Plaintiff's side. *Scott v. Harris*, 550 U.S. at 380. From the Lobby Video, which provides the best view of all Parties, it is clear that Larrier and Wenzel applied some degree of force to Plaintiff, as Plaintiff appears to lean backward while he walked forward. (Lobby Video 2:45–2:50.) Plaintiff also stated, "Don't you push me"; thus, viewing all facts in favor of the non-moving party, Larrier and Wenzel were, in fact, pushing Plaintiff. (Defs.' Wenzel Video 2:03–2:06.) Similarly, when Plaintiff hit the ground, he screamed in pain and exclaimed, "I hit my head," and "I can't move." (Id. at 2:06–2:20.) Although Larrier told Plaintiff that he did not hit his head, it is not clear that this injury did not occur. For example, in the Wenzel Video, there is a moment where Plaintiff's head may have hit the non-carpeted portion of the floor. (Id. at 2:05–2:07.) Further, at the time of Plaintiff's fall, he does not seem to have been actively resisting arrest, as he was moving forward with the officers. (Lobby Video 2:40–2:50.) It is also plausible that Larrier and Wenzel pulled Plaintiff off the floor, as they

brought his arms up above him and applied some degree of force to move him upward. (*Id.* at 2:50–3:05.)

"[E]ven when there is a video, courts must still draw reasonable inferences in the non-moving party's favor," and "[w]here . . . there is no clear contradiction between the [p]laintiff's testimony and the . . . video, the [c]ourt must draw justifiable inferences in the [p]laintiff's favor." *Mack v. Howard*, No. 11-CV-303, 2014 WL 2708468, at *2 (W.D.N.Y. June 16, 2014). Thus, drawing all reasonable inferences in Plaintiff's favor, the Court cannot readily determine from the video evidence whether Plaintiff stumbled, or whether the force exerted by Larrier and Wenzel caused him to fall. The Court also cannot determine whether Plaintiff hit his head, and whether he was yanked up by Larrier and Wenzel. *See Maxwell v. City of New York*, 380 F.3d 106, 109–10 (2d Cir. 2004) (vacating a district court's grant of summary judgment with respect to a claim of excessive force when the plaintiff alleged that she hit her head on a police car's partition and cried out in pain when she was "violently shoved" by an officer into the car).

Plaintiff has also offered evidence that he suffered long-lasting injuries during the course of the arrest, which could "give rise to the inference that Plaintiff hit his head [and was yanked from the floor] with a significant amount of force." *Crawford*, 2014 WL 186417, at *5. For example, Plaintiff's June 2018 MRI found a "small [r]egion of . . . cystic encephalomalacia" on the left lateral frontal lobe of his head, the portion of his head that may have hit the ground. (Chorny Dep. Tr. 95; Carniciu Dep. Tr. 90.) Plaintiff also identified additional injuries that he suffered to his arms and shoulders as a result of the incidents. Although Defendants argue that these injuries were related to older conditions of which Plaintiff did not inform Larrier and Wenzel, (Defs.' Mem. 15, 18; Defs.' Reply 2–3), this is not the case for every injury. For example, on March 20, 2017, Plaintiff's orthopedist noted that Plaintiff suffered from "bilateral

new rotator cuff tears" as a result of the incidents, and that he also suffered from a right knee sprain and "bilateral shoulder sprains," neither of which appear to have predated January 25, 2017. (Medical Records 12–13.) A year after the incidents, a different doctor noted that Plaintiff was suffering from spinal swelling. (*Id.* at 9.) Further, Plaintiff continuously suffered increasing "sharp and stabbing" pain in his shoulders, neck, and lower back "100% of the time" after the incidents. (*Id.* at 2–3.) Plaintiff also testified that he began taking oxycodone for the pain. (Pl.'s Pl. Dep. Tr. 10.) Such injuries are sufficiently serious that, if they were in fact caused by force used by Larrier and Wenzel, a reasonable juror could find that such force was unreasonable. Thus, it is appropriate for a "jury to assess [Plaintiff's] account of what occurred during [the] arrest." *Maxwell*, 380 F.3d at 109 (noting that the plaintiff alleged that the "shove" caused her to suffer from "pain in her arm and lower back," a headache, and "post-concussive syndrome"); *see also Robison v. Via*, 821 F.2d 913, 923–24 (2d Cir. 1987) (finding that the plaintiff's allegations that a police officer pushed her against a car door, yanked her out, twisted her arms behind her back, and threw her against a fender, causing only bruises that lasted for two weeks, were "sufficient to prevent the summary dismissal" of an excessive force claim).

### iii.  Handcuffing

With respect to Plaintiff's claim of excessive force based on the tightness of his handcuffs, the Court applies a separate standard. *See Sachs v. Cantwell*, No. 10-CV-1663, 2012 WL 3822220, at *14 (S.D.N.Y. Sept. 4, 2012). This particularized standard reflects the need to balance the "right to use some degree of physical coercion," including the use of handcuffs "tight enough to prevent the arrestee's hands from slipping out," *Esmont v. City of New York*, 371 F. Supp. 2d 202, 214 (E.D.N.Y. 2005) (citation omitted), with the use of "overly tight handcuffing" that could constitute excessive force, *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp.

2d 459, 468 (S.D.N.Y. 2008) (collecting cases).  When considering whether handcuffing constitutes excessive force, a court "is to consider evidence that: [(]1) the handcuffs were unreasonably tight; [(]2) the defendants ignored the arrestee's pleas that the handcuffs were too tight; and [(]3) the degree of injury to the wrists."  *Usavage*, 932 F. Supp. 2d at 592 (citation and quotation marks omitted); *see also Pelayo v. Port Auth.*, 893 F. Supp. 2d 632, 642 (S.D.N.Y. 2012) (same).  Additionally, "there is a consensus among courts in [the Second Circuit] that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort."  *Usavage*, 932 F. Supp. 2d at 592 (citation, alteration, and quotation marks omitted).  "These injuries need not be severe or permanent, but must be more than merely de minimis."  *Id.* (citations and quotation marks omitted).

As an initial matter, there is a factual dispute over what caused Plaintiff's wrist injuries.  Plaintiff avers that his wrists began to bleed because of the handcuffs.  (Pl.'s Pl. Dep. Tr. 106.)  According to Perlera, however, Plaintiff told EMTs on the night of the incidents that his injuries occurred when he tried to take off the handcuffs.  (Defs.' Perlera Dep. Tr. 18.)  Perlera further testified that Plaintiff's bleeding had stopped by the time the EMTs arrived, (*id.* at 33, 50), but Dr. Chorny testified that when she saw Plaintiff the day after the incidents, his wrists and other injuries were still bleeding, (Pl.'s 56.1 ¶ 237 (citing Medical Records 5)).  Thus, there is an issue of fact as to how Plaintiff's wrist injuries were caused and for how long he was bleeding, which precludes the Court from granting summary judgment.  Moreover, each of the handcuffing "factors" supports Plaintiff's claim that the handcuffs originally applied by Larrier and Wenzel were overly tight.

First, Plaintiff repeatedly asked Larrier and Wenzel to loosen his handcuffs, which they failed to do until Plaintiff arrived at the station.  For example, he stated, "They're too tight, I

can't move," "Please loosen the handcuffs," "I can hardly hold my wrists up," and "I'm bleeding" both before and after he got into the police vehicle. (Defs.' Wenzel Video 3:15–5:00.) Second, Plaintiff alleges injuries beyond superficial abrasions or soreness, which courts typically find insufficient to sustain an excessive force claim with respect to handcuffs. *See Selvaggio v. Patterson*, 93 F. Supp. 3d 54, 74–75 (E.D.N.Y. 2015) (granting summary judgment on an excessive force claim where the evidence showed only minimal injuries such as scabbing and abrasions); *Wilder v. Village of Amityville*, 288 F. Supp. 2d 341, 344 (E.D.N.Y. 2003) ("Plaintiff's allegation of sore, yet uninjured, wrists simply does not rise to the level of . . . unlawful conduct in an arrest situation."), *aff'd*, 111 F. App'x 635 (2d Cir. 2004), *cert. denied*, 544 U.S. 949 (2005). It is clear from the Wenzel Video that Plaintiff suffered a fair amount of bleeding from his wrists. When Wenzel lifted Plaintiff's jacket at WPPD Station, it had a large blood stain on it, and Plaintiff's hands appeared to be covered in blood as he was seated and handcuffed. (Defs.' Wenzel Video 11:30–12:20.) Further, Plaintiff sought medical care the following day, and Dr. Chorny noted that Plaintiff's wrists were "still bleeding." (Medical Records 5.) *See Usavage*, 932 F. Supp. 2d at 593 ("The fact that a plaintiff sought emergency medical treatment right after a handcuffing incident may also support a finding of injury at the summary judgment stage." (citation omitted)). Indeed, one doctor noted five days after the incidents that Plaintiff still had visible contusions that may have been caused by the handcuffs. (Pl.'s 56.1 ¶ 248 (citing Medical Records 11; Robbins Dep. Tr. 57).) This further underscores Plaintiff's excessive force claims. *See Lucky v. City of New York*, No. 03-CV-1983, 2004 WL 2088557, at *7 (S.D.N.Y. Sept. 20, 2004) (denying summary judgment because "[w]hile [the plaintiff's] injuries appear de minimis, his statements that he was shoved . . . in a manner that injured his shoulder and that the handcuffs were placed so as to leave red marks on his wrists [for

one week] raise material issues of fact"), *aff'd*, 140 F. App'x 301 (2d Cir. 2005); *Simpson v. Saroff*, 741 F. Supp. 1073, 1078 (S.D.N.Y. 1990) (denying summary judgment where the plaintiff alleged "swollen and bleeding wrists from the tight handcuffs, as well as a faintly detectable scar on [the plaintiff's] left wrist"); *cf. Hollins v. City of New York*, No. 10-CV-1650, 2014 WL 836950, at *9 (S.D.N.Y. Mar. 3, 2014) (granting summary judgment where the plaintiff testified that handcuffs caused her pain and bruising, but not bleeding, that lasted only a day); *Otero v. Town of Southampton*, 194 F. Supp. 2d 167, 180 (E.D.N.Y. 2002) (noting, in granting a motion for summary judgment, that the plaintiff did not allege that the handcuffs caused her wrists to bleed, and that the plaintiff did not request to see a doctor about her wrists), *aff'd*, 59 F. App'x 409 (2d Cir. 2003).[22]

Plaintiff's medical records also suggest that the tight handcuffing may have caused carpal tunnel syndrome and progressive numbness in Plaintiff's wrists, which are symptoms that district courts in the Second Circuit have found sufficient to constitute an injury by tight handcuffing. (*See* Medical Records 20; *see also* Spencer Dep. Tr. 42–43.) *See, e.g.*, *Usavage*, 932 F. Supp. 2d at 592 (denying summary judgment where there was evidence that the plaintiff suffered from nerve damage after handcuffing and noting that "[t]he most common injuries found to satisfy the injury requirement in handcuff cases are scarring and nerve damage" (collecting cases)); *cf. Matthews v. City of New York*, 889 F. Supp. 2d 418, 442 (E.D.N.Y. 2012) ("[U]nsubstantiated claims of nerve damage, in the absence of corroborating medical evidence, are insufficient to

---

[22] Moreover, it bears noting that Larrier and Wenzel may not have double-locked Plaintiff's handcuffs, a mechanism that prevents handcuffs from tightening. (Pl.'s 56.1 ¶ 201 (citing Pl.'s FitzMaurice Dep. Tr. 58–61).) *See Sharnick v. D'Archangelo*, 935 F. Supp. 2d 436, 447 (D. Conn. 2013) ("Assuming the truth of [the plaintiff's] statements, . . . a rational jury could certainly find that [the defendant] used excessive force when he allegedly failed to double lock the handcuffs, and allegedly did not stop the police cruiser when [the plaintiff] cried out in pain." (quotation marks omitted).)

sustain a claim of excessive force from handcuffing." (citations and quotation marks omitted)).

Thus, the Court denies summary judgment with respect to Plaintiff's excessive force claims against Defendants Larrier and Wenzel related to the tightness of his handcuffs. The Court later addresses Defendants' qualified immunity arguments as to these claims.

<u>c. Defendant Robinson</u>

Plaintiff also asserts excessive force and failure to intervene claims against Robinson, arguing that his treatment at WPPD Station was a "continuation of the excessive force initially applied by Larrier and Wenzel," and that Robinson failed to intervene when handcuffs were "re-applied to [Plaintiff's] bleeding wrists" at WPPD Station. (Pl.'s Mem. 14–15, 20.)

Claims of excessive force or failure to intervene against Robinson cannot survive summary judgment because Robinson did not participate in, and was not present for, any instances of excessive force. First, it is undisputed that Robinson was not present at the scene of Plaintiff's arrest, where Larrier and Wenzel used allegedly unreasonable force, and the handcuffs that Plaintiff alleges were too tight were removed upon Plaintiff's arrival at WPPD Station. (Defs.' Wenzel Video 10:50–12:30.) Second, once Plaintiff arrived at WPPD Station, there is no evidence to suggest that any incidents of excessive force occurred.

Plaintiff argues that his re-handcuffing at WPPD Station and shackling and re-handcuffing to go to White Plains Hospital constituted excessive force. (Pl.'s Mem. 15.) However, as stated, when considering whether handcuffing constitutes excessive force, a court "is to consider evidence that: [(]1) the handcuffs were unreasonably tight; [(]2) the defendants ignored the arrestee's pleas that the handcuffs were too tight; and [(]3) the degree of injury to the wrists." *Usavage*, 932 F.Supp.2d at 592 (citation and quotation marks omitted). With respect to Plaintiff's re-handcuffing at WPPD Station and shackling before going to the hospital, Plaintiff

made, and thus Robinson ignored, no complaints about the tightness of the handcuffs. Indeed, Plaintiff testified that he did not complain about the second handcuffing because "[a]t that point[,] [the handcuffs] had been loosened." (Pl.'s Pl. Dep. Tr. 133–134.) *See Esmont*, 371 F. Supp. 2d at 215 (finding that a plaintiff could not "establish an excessive force claim based on tight handcuffing in the absence of a request to loosen them" (citations omitted)). Although Plaintiff's wrists were already allegedly injured from the first time he was handcuffed, there is no evidence in the record to suggest that the re-handcuffing and shackling of Plaintiff exacerbated his existing injuries. Further, the Court cannot find that it was unreasonable for Robinson to re-handcuff, and later shackle, Plaintiff, as he had been non-compliant with Larrier and Wenzel earlier in the evening. *See Morrison v. City of Hudson*, No. 14-CV-1409, 2017 WL 4357456, at *10 (N.D.N.Y. Sept. 29, 2017) (dismissing claim against a defendant because, inter alia, the plaintiff was already in handcuffs when she arrived at the station, admitted that she did not suffer injury from leg restraints that the defendant put her in, and it was "police policy" to use ankle restraints on individual processed at the police station (record citations omitted)); *Levy v. City of New York*, 935 F. Supp. 2d 575, 595 (E.D.N.Y. 2013) (finding that no reasonable jury could conclude that a police officer was on notice of allegedly excessive force because the plaintiff did not complain to this officer about overly tight handcuffs, and the handcuffs were removed soon after the plaintiff arrived at the station).

In order for Plaintiff to bring an excessive force claim against Robinson, he would need to demonstrate that Robinson used "force [that was] objectively unreasonable in light of the facts and circumstances," *Jones*, 465 F.3d at 61 (citation and quotation marks omitted), and that the force was "more than de minimis," *Musso*, 2008 WL 3200208, at *4 (citation and quotation marks omitted). For a failure to intervene claim, Robinson would have had to fail to "intercede

on the behalf of [Plaintiff whose] constitutional rights [we]re being violated in [Robinson's] presence by other officers." *Harris*, 2017 WL 4334141, at *9 (citation and quotation marks omitted). Here, there is no evidence on the record to support either claim, as Plaintiff has not demonstrated that Robinson used any "objectively unreasonable" force, or that Robinson was present during any alleged violations of Plaintiff's constitutional rights. Thus, the Court finds that no reasonable juror could conclude that Robinson directly engaged, or failed to intervene, in excessive force against Plaintiff. Defendants' Motion with respect to these claims is granted.

### d. Qualified Immunity

Defendants argue that qualified immunity should apply with respect to Plaintiff's initial arrest and handcuffing. (Defs.' Mem. 12, 14.) With respect to the excessive force claims that survive summary judgment, the Court concludes that qualified immunity is not proper at this stage.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation and quotation marks omitted). Qualified immunity shields a defendant from standing trial or facing other burdens of litigation "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001) (citations and quotation marks omitted).

If Plaintiff's account with respect to the alleged push by Larrier and Wenzel and excessively tight handcuffs is to be credited, "this case would not involve the hazy border between excessive and acceptable force," but rather "the violation of a clearly established right

for which qualified immunity is unavailable." *Davis v. City of New York*, No. 04-CV-3299, 2007 WL 755190, at *16 (E.D.N.Y. Feb. 15, 2007) (quotation marks omitted) (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)); *see also Felmine v. City of New York*, No. 09-CV-3768, 2011 WL 4543268, at *20 (E.D.N.Y. Sept. 29, 2011) ("[T]he qualified immunity inquiry turns on whether the defendants' actions were objectively reasonable under clearly established law; and the clearly established law of excessive force itself hinges on the reasonableness of the force used." (citation omitted)). As there are issues of disputed fact that need to be decided by a jury—in particular, whether excessive force was used during Plaintiff's arrest—the matter of Larrier's and Wenzel's qualified immunity cannot be resolved as a matter of law. *See id.* ("Since the degree and reasonableness of the officers' use of force against the plaintiff remains an issue of disputed fact, the [c]ourt likewise cannot conclude as a matter of law that the defendants' actions were reasonable for qualified immunity purposes."); *Bennett v. Falcone*, No. 05-CV-1358, 2009 WL 816830, at *6 (S.D.N.Y. Mar. 25, 2009) ("[T]he question of whether it was reasonable for [the defendant] to believe that his actions did not violate clearly established constitutional rights is one that depends on whether one believes his version of events.").

### 2. Deliberate Indifference to Medical Needs

#### a. Applicable Law

Because Plaintiff was a pre-trial detainee at the time he was allegedly denied medical care, Plaintiff's claim falls under "the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight[h] Amendment," *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (citation omitted). A pre-trial detainee's rights are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *Id.*

(quotation marks omitted) (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

"'[W]hile in custody, a pretrial detainee has a Fourteenth Amendment substantive due process right to care and protection, including protection from suicide' resulting from a pre-existing mental health disorder." *Case v. Anderson*, No. 16-CV-983, 2017 WL 3701863, at *8 (S.D.N.Y. Aug. 25, 2017) (quoting *Kelsey v. City of New York*, 306 F. App'x. 700, 702 (2d Cir. 2009)). "'A pretrial detainee may establish a § 1983 claim for allegedly unconstitutional conditions of confinement'—such as the denial of mental health care—'by showing that the officers acted with deliberate indifference to the challenged conditions.'" *Id.* To establish a claim for deliberate indifference to medical needs under the Due Process Clause of the Fourteenth Amendment, a pre-trial detainee must establish two elements: (1) that the "deprivation of medical care . . . [was] 'sufficiently serious,'" and (2) that the defendant "acted or failed to act with 'a sufficiently culpable state of mind.'" *Smith v. Outlaw*, No. 15-CV-9961, 2017 WL 4417699, at *2 (S.D.N.Y. Sept. 30, 2017) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006); *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

"The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious." *Spavone v. New York State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (citation and quotation marks omitted). "There is no static test to determine whether a deprivation is sufficiently serious; instead, the conditions themselves must be evaluated in light of contemporary standards of decency." *Darnell*, 849 F.3d at 30 (citation and quotation marks omitted). Analyzing this objective requirement involves two inquiries: "[t]he first inquiry is whether the [detainee] was actually deprived of adequate medical care," *Salahuddin*, 467 F.3d at 279, and the second "asks whether the inadequacy in medical care is

sufficiently serious. This inquiry requires the [C]ourt to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the [detainee]," *id.* at 280. To meet the objective requirement, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his [or her] health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citations omitted). "There is no settled, precise metric to guide a court in its estimation of the seriousness of [a detainee's] medical condition." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003). Nevertheless, the Second Circuit has presented the following non-exhaustive list of factors to consider when evaluating a detainee's medical condition: "(1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Id.* (quotation marks omitted) (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)); *see also Morales v. Fischer*, 46 F. Supp. 3d 239, 247 (W.D.N.Y. 2014) (same). Generally, the condition must be "'a condition of urgency' that may result in 'degeneration' or 'extreme pain.'" *Grimmett v. Corizon Med. Assocs. of N.Y.*, No. 15-CV-7351, 2017 WL 2274485, at *3 (S.D.N.Y. May 24, 2017) (quoting *Chance*, 143 F.3d at 702)).

The second requirement is the "mens rea prong."[23] "Prior to the Second Circuit's decision in *Darnell*, 849 F.3d 17, the second element—whether the defendant acted with a sufficiently culpable state of mind—was evaluated subjectively." *Ryan v. County of Nassau*, No. 12-CV-5343, 2018 WL 354684, at *3 (E.D.N.Y. Jan. 10, 2018) (citation omitted). However, in

---

[23] In *Darnell*, the Second Circuit indicated that this prong should be referred to the "mens rea prong," rather than the subjective prong, to prevent confusion. *See Darnell*, 849 F.3d at 29 (italics omitted).

*Darnell*, in light of the Supreme Court's decision in *Kingsley v. Henderickson*, 135 S. Ct. 2466 (2015), the Second Circuit held that when a claim arises under the Fourteenth Amendment, "the pretrial detainee must prove that the defendant-official acted intentionally" in depriving adequate medical care, "or recklessly failed to act with reasonable care . . . even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35; *see also Ryan*, 2018 WL 354684, at *3 (same). "In other words, the second element of a deliberate indifference claim under the Fourteenth Amendment 'is defined objectively,' and a plaintiff is not required to show subjective awareness by the defendant that '[his] acts (or omissions) have subjected the pre-trial detainee to a substantial risk of harm.'" *Ryan*, 2018 WL 354684, at *3 (quoting *Darnell*, 849 F.3d at 35).[24] Despite the slightly lower standard articulated in *Darnell*, which is akin to objective recklessness, "any § 1983 claim for a violation of due process requires proof of a mens rea greater than mere negligence." *Smith*, 2017 WL 4417699, at *3 (quoting *Darnell*, 849 F.3d at 36) (italics omitted); *see also Ryan*, 2018 WL 354684, at *3 (same); *Grimmett*, 2017 WL 2274485, at *4 (same). "A detainee must prove that an official acted intentionally or recklessly, and not merely negligently." *Darnell*, 849 F.3d at 36.

Additionally, where a plaintiff's claim is "based on temporary delay or interruption in treatment, the serious medical need inquiry can properly take into account the severity of the temporary deprivation alleged by the [detainee]." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003) (citations and footnote omitted). "[It is] the particular risk of harm faced by a [detainee] due to the challenged deprivation of care, rather than the severity of the [detainee's] underlying

---

[24] The Second Circuit has since confirmed that "[a]lthough *Darnell* did not specifically address medical treatment, the same principle applies" to such claims. *Charles v. Orange County*, 925 F.3d 73, 87 (2d Cir. 2019) (citation omitted).

medical condition, considered in the abstract, that is relevant . . . ." *Id.* (citations omitted).

"[A]lthough a delay in providing necessary medical care may in some cases constitute deliberate indifference, the Second Circuit has reserved such a classification for cases in which, for example, officials ignored a life-threatening and fast-degenerating condition for three days, or delayed major surgery over two years." *Jones v. Westchester County*, 182 F. Supp. 3d 134, 155 (S.D.N.Y. 2016) (citation, alteration, and quotation marks omitted); *see also Ramos v. Artuz*, No. 00-CV-149, 2003 WL 342347, at *10 (S.D.N.Y. Feb. 14, 2003) (same).

### b. Application

Plaintiff argues that his claims against Larrier, Wenzel, and Robinson center on "whether the *delay* of medical attention constituted deliberate indifference." (Pl.'s Mem. 15 (emphasis added).) Because Plaintiff did not suffer from a "life-threatening and fast-degenerating condition," *Jones*, 182 F. Supp. 3d at 155, claims of deliberate indifference to Plaintiff's medical needs must fail.

First, "[a]lthough especially tight handcuffs may help establish an excessive force claim, it cannot be said that [the] resulting injuries . . . could have produced death, degeneration, or extreme pain." *Mikulec v. Town of Cheektowaga*, 909 F. Supp. 2d 214, 223 (W.D.N.Y. 2012) (citations and quotation marks omitted); *see also Leibovitz v. City of New York*, No. 14-CV-3297, 2015 WL 13746665, at *14 (S.D.N.Y. Dec. 18, 2015) (same), *adopted by* 2016 WL 1189526 (S.D.N.Y. Mar. 21, 2016); *Evering v. Reilly*, No. 98-CV-6718, 2001 WL 1150318, at *9 (S.D.N.Y. Sept. 28, 2001) ("Unlike the excessive force standard, deliberate indifference requires injuries that demonstrate urgency leading to death, degeneration[,] or extreme pain." (citation omitted)). Similarly, Plaintiff's allegations of dizziness and nausea are insufficient to establish such a condition. *See Dollard v. City of New York*, 408 F. Supp. 3d 231, 237 (E.D.N.Y. 2019)

("Plaintiff's difficulty breathing, vertigo, and brief losses of consciousness are not conditions of urgency that may produce death, degeneration, or extreme pain." (citation, alterations, and quotation marks omitted)).

Further, Plaintiff does not allege a serious delay in the provision of medical care, as he received medical treatment within, at most, an hour of complaining of his injuries. Indeed, Wenzler called for an ambulance immediately upon arriving at WPPD Station, (Defs.' 56.1 ¶ 86), and although there was a delay in its arrival, as soon as Plaintiff fell off of his chair, Robinson escalated the situation by calling a mutual aid ambulance, (*id.* ¶ 109), after which an ambulance arrived in approximately five minutes, (*id.* ¶¶ 110–14). *See Dollard*, 408 F. Supp. 3d at 237–38 (finding no deliberate indifference when an officer called for an ambulance as soon as the plaintiff lost her balance and stated that she could not breathe). Further, it is undisputed that the original call from Benge to WPPD Station was made at 8:50 p.m. (Defs.' 56.1 ¶ 8; Pl.'s 56.1 ¶ 8.) It is also undisputed that EMTs were by Plaintiff's side by 9:32 p.m., and he was taken to White Plains Hospital by 9:50 p.m. (*Id.* ¶ 115; Pl.'s 56.1 ¶¶ 115, 218.) Thus, at most, an hour elapsed between the time of the original call from Benge (which is earlier than the time when Plaintiff would have suffered any of the alleged injuries), and the time when Plaintiff was taken to the hospital. Such a delay is insufficient to support a deliberate indifference claim when Plaintiff has pointed to no evidence demonstrating that his alleged injuries required any more immediate attention, and when an ambulance was called as soon as he fell off of his chair. *See Watts v. N.Y.C. Police Dep't*, 100 F. Supp. 3d 314, 327–28 (S.D.N.Y. 2015) (one-day delay in bringing the plaintiff to hospital for treatment was insufficiently serious); *Fuentes v. Balcer*, No. 10-CV-684, 2013 WL 276679, at *8 (S.D.N.Y. Jan. 24, 2013) (finding that medical care was provided within approximately one hour and ten minutes and thus was within the category of

"temporary delay" that courts have "generally recognized as insufficient to support a deliberate indifference claim" (citation and quotation marks omitted)); *Bradley v. Rell*, 703 F. Supp. 2d 109, 123 (N.D.N.Y. 2010) (granting in part summary judgment where pretrial detainee was taken by ambulance to the emergency room within four hours of sustaining injuries during an arrest); *Osuna v. City of New York*, No. 08-CV-4759, 2009 WL 2356424, at *5 (S.D.N.Y. July 30, 2009) (highlighting the undisputed evidence that the plaintiff was admitted to a hospital no later than 75 minutes after arrest). Moreover, cases where delays of medical care have been held to satisfy the objective requirement have involved "either a needlessly prolonged delay or a delay that caused extreme pain or exacerbated a serious illness." *Leibovitz*, 2015 WL 13746665, at *15; *see Salahuddin*, 467 F.3d at 281 (five-month postponement of Hepatitis C treatment constituted a sufficiently serious delay); *Hathaway v. Coughlin*, 37 F.3d 63, 67–68 (2d Cir. 1994) (over two-year delay in treatment of broken pin in the plaintiff's hip that caused persistent pain satisfied the objective prong); *Hunter v. City of New York*, 35 F. Supp. 3d 310, 320 (E.D.N.Y. 2014) (five-day delay after an arrest in treating the plaintiff's fractured rib constituted a serious medical condition).

Plaintiff similarly fails to demonstrate any evidence regarding the mens rea prong, which requires that Defendants "knew that failing to provide the complained of medical treatment would pose a substantial risk to [Plaintiff's] health or . . . should have known that failing to provide the omitted medical treatment would pose a substantial risk to [Plaintiff's] health." *Charles*, 925 F.3d at 87 (emphasis omitted). Although Plaintiff suggests that Larrier, Wenzel, and Robinson all knew of his injuries, the record shows no *excessive* risk of which Defendants were aware, or should have been aware, and further demonstrates that Plaintiff received medical treatment in a timely manner after his arrest was processed. Cases cited by Plaintiff in support of

his argument are distinguishable, as they involve far lengthier delays—or outright denial of—medical care. *See Mills v. Fenger*, 216 F. App'x 7, 10 (2d Cir. 2006) (involving a plaintiff who suffered a ruptured patellar tendon during arrest and who, according to the underlying district court opinion, alleged that he was held overnight without medical care); *Weyant v. Okst*, 101 F.3d 845, 849–50, 857 (2d Cir. 1996) (involving a "severe diabetic [plaintiff] in insulin shock," who the defendants did not bring to the hospital at all during his detention, despite the fact that he was slumped over, perspiring, unable to speak, and repeatedly losing consciousness).

Thus, summary judgment is granted to Defendants on the claims of deliberate indifference to medical care.[25]

### 3. Supervisory Liability

#### a. Applicable Law

It is well established that respondeat superior is not a basis for liability under § 1983. *See Blyden v. Mancusi*, 186 F.3d 252, 264 (2d Cir. 1999); *see also Carrillos v. Incorporated Village of Hempstead*, 87 F. Supp. 3d 357, 382 (E.D.N.Y. 2015); *Jamison v. Fischer*, No. 11-CV-4697, 2012 WL 4767173, at *3 (S.D.N.Y. Sept. 27, 2012). Instead, a plaintiff seeking to hold a supervisory defendant liable pursuant to § 1983 must allege personal involvement by the defendant, a requirement that may be satisfied by alleging that

---

[25] Plaintiff includes as an exhibit the Second Circuit's decision in *Charles*, noting that it "further expound[s] on the constitutional duty owed to a detainee under the Due Process Clause . . . to provide for their safety and general well-being[,] and that deliberate indifference to a pretrial detainee[']s medical needs shocks the conscience." (Pl.'s Mem. 15 n. 2 (citation and quotation marks omitted).) Although the case does expound on the standard for deliberate indifference to medical care, 925 F.3d at 86–87, the facts are distinguishable, and Plaintiff does not further explain how the case is applicable here. In *Charles*, the plaintiff-appellants were "confined for many months," suffered from "serious, ongoing mental illnesses," and brought claims related to discharge planning before they were released from custody. *Id.* at 77. Here, Plaintiff was confined for one evening and makes no claims related to medical care after his release.

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citation omitted).  Although courts in the Second Circuit have been divided as to whether these categories may still be used as bases for liability under § 1983, this Court has previously agreed that *Colon* still controls with respect to claims that do not require a showing of discriminatory intent. *Lebron v. Mrzyglod*, No. 14-CV-10290, 2017 WL 365493, at *3–5 (S.D.N.Y. Jan. 23, 2017).  As Plaintiff does not raise a claim of unconstitutional discrimination, the Court examines the claims of supervisory liability against Larrier and Robinson under the five categories in *Colon*.  Further, because the Court grants summary judgment with respect to Plaintiff's deliberate indifference claims, the Court considers the claims of supervisory liability only with respect to Plaintiff's allegations of excessive force.

### b.  Defendant Larrier

As discussed above, the only allegations of excessive force that are actionable under § 1983 are Larrier and Wenzel's alleged pushing and excessively tight handcuffing of Plaintiff. A separate claim against Larrier for supervisory liability "is clearly duplicative . . . when the direct claim of excessive force is proceeding against him for that action." *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 394 (S.D.N.Y. 2013); *see also Burch v. City of New York*, No. 11-CV-2841, 2016 WL 11430773, at *16 (E.D.N.Y. Apr. 22, 2016) ("[Plaintiff] may not assert a second set of identical claims premised on the same conduct under the label 'supervisory liability.'").  Further, Plaintiff appears to have abandoned this claim against Larrier as he does

not address it in his Opposition, beyond naming Larrier in the section title.  (*See generally* Pl.'s

Opp'n 20–21.)  *See Maher v. Alliance Mortg. Banking Corp.*, 650 F. Supp. 2d 249, 267

(E.D.N.Y. 2009) ("Federal courts may deem a claim abandoned when a party moves for

summary judgment on one ground and the party opposing summary judgment fails to address the

argument in any way." (citation and quotation marks omitted)).  Thus, the Court grants summary

judgment with respect to Plaintiff's supervisory liability claim against Larrier.

### c.  Defendant Robinson

As discussed, Plaintiff has failed to establish that any incidents of excessive force

occurred once he arrived at WPPD Station and has also failed to establish that Defendants were

deliberately indifferent to his medical needs.  Thus, the only possible claim of supervisory

liability against Robinson is with respect to the allegations of excessive force arising from

Plaintiff's initial arrest.  However, in his Opposition, Plaintiff states only that, "[r]egarding . . .

Robinson, Plaintiff can establish personal involvement, and thus liability, of a supervisor if he

. . . failed to remedy the violation after being informed of it, was grossly negligent in supervising

subordinates who committed the violation, or was deliberately indifferent to the rights of others

by failing to act on information that constitutional rights were being violated."  (Pl.'s Mem. 21.)

This allegation merely restates the *Colon* factors and is insufficient to defeat a summary

judgment motion.  *See Davis v. City of New York*, 316 F.3d 93, 100 (2d Cir. 2002)

("[C]onclusory statements or mere allegations [are] not sufficient to defeat a summary judgment

motion." (citations omitted)).

In arguing that Robinson used excessive force, Plaintiff alludes to a claim of supervisory

liability, stating, "Robinson extended and exacerbated [Plaintiff's] suffering by his words and

deeds . . . .  It is for a jury . . . to decide if the conditions of [Plaintiff's] confinement, in light of

the injuries he had sustained, were sufficiently unreasonable to constitute excessive force, even in the absence of physical contact by . . . Robinson." (Pl.'s Mem. 15.) However, Plaintiff did not raise a conditions of confinement claim in his Amended Complaint, and the cases cited by Plaintiff are distinguishable from the facts at hand. *See Merrill v. Schell*, 279 F. Supp. 3d 438, 444–45 (W.D.N.Y. 2017) (involving a failure to intervene claim against a defendant who was in the police vehicle when another defendant pulled his gun on a compliant plaintiff); *Smart v. City of New York*, No. 08-CV-2203, 2009 WL 862281, at *10 (S.D.N.Y. Apr. 1, 2009) (determining that the plaintiff's conditions of confinement may have been intended to have a punitive effect when his requests for food, water, and the bathroom were ignored for over 14 hours, even after he vomited in his cell). Given that such a claim is not included in Plaintiff's Amended Complaint, the Court will not address it here.

### 4. State Law Claims

#### a. Assault and Battery

"Assault and battery claims, when alleged against a police officer, are evaluated like excessive force claims." *Brown v. City of New York*, No. 11-CV-1068, 2013 WL 491926, at *10 (S.D.N.Y. Feb. 8, 2013) (citation omitted); *see also Posr v. Doherty*, 944 F.2d 91, 94–95 (2d Cir. 1991) (stating that "except for § 1983's requirement that the tort be committed under color of state law," the "essential elements" of "§ 1983 use of excessive force and state law assault and battery" are "substantively identical" (citation omitted)). "Application of physical force is excessive when it is more than is necessary under the circumstances." *Brown*, 2013 WL 491926, at *10 (citation omitted).

Although Defendants argue that a civil assault claim cannot prevail when probable cause for an arrest is not challenged, (Defs.' Mem. 22), this argument oversimplifies the law. "A

lawful arrest is not an assault or battery under New York law, *provided* the force used is reasonable." *Figueroa v. Mazza*, 825 F.3d 89, 105 n.13 (2d Cir. 2016) (emphasis added) (citation omitted); *see also Li v. United States*, No. 05-CV-6237, 2009 WL 3321014, at *1 n.2 (S.D.N.Y. Oct. 8, 2009) ("As against law enforcement personnel, assault and battery claims under New York law parallel the Fourth Amendment standard governing the use of force incident to a lawful arrest." (collecting cases)). Indeed, the court in the case cited by Defendants for this proposition, *Boyler v. City of Lackawanna*, 287 F. Supp. 3d 308 (W.D.N.Y. 2018), did not grant summary judgment to the defendants solely because there was probable cause for the arrest. *See id.* at 326–27 (granting summary judgment where, inter alia, the plaintiff had provided no evidence that certain defendants were personally involved in the arrest, did not allege any physical injuries, and the officers effectuating the arrest had used de minimis force (collecting cases)), *aff'd*, 765 F. App'x 493 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 63 (2019).

Thus, because Plaintiff's excessive force claims against Larrier and Wenzel remain, so too do Plaintiff's state claims for assault and battery against these Defendants, and against Defendant White Plains under the theory of respondeat superior. *Williams v. City of White Plains*, 718 F. Supp. 2d 374, 381 (S.D.N.Y 2010) ("The remaining state law claim of assault and battery against the City of White Plains is alive due to the potential for vicarious liability for actions of its police officers as its employees." (citation omitted)). Defendants' Motion with respect to these claims is denied.

### b. Negligence

In New York, in an action for negligence, a plaintiff must prove three elements: "'(1) the existence of a duty on [the] defendant's part to [the] plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof.'" *Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114

(2d Cir. 2000) (quoting *Akins v. Glens Falls City Sch. Distr.*, 424 N.E.2d 531, 535 (N.Y. 1981)). Plaintiff appears to bring negligence claims against all Defendants for use of excessive force, deliberate indifference to medical needs, failure to intervene, and denial of proper medical care.

Defendants argue that "negligence claims cannot coexist with claims for intentional torts." (Defs.' Mem. 23 (citation and quotation marks omitted).) However, "[i]t is well settled that a plaintiff may plead excessive force and negligence in the alternative," *Daniels v. City of New York*, No. 16-CV-9080, 2018 WL 4680990, at *5 (S.D.N.Y. Sept. 27, 2018) (collecting cases), but if "the conduct alleged, if true, may only give rise to liability for an intentional act, a claim of negligence may be dismissed," *Bah v. City of New York*, No. 13-CV-6690, 2014 WL 1760063, at *13 (S.D.N.Y. May 1, 2014) (collecting cases); *see also Ziming Shen v. City of New York*, 725 F. App'x 7, 16–17 (2d Cir. 2018) (finding that because the record, construed in the light most favorable to the plaintiff, showed that the touching of the plaintiff was "neither inadvertent nor accidental," the plaintiff could not bring claims of both excessive force and negligence (citation omitted)), *cert. denied*, 139 S. Ct. 78 (2018); *Cagliostro v. Madison Square Garden, Inc.*, 901 N.Y.S.2d 222, 223–24 (App. Div. 2010) (dismissing negligence claim as "simply contrary to [the plaintiff's] testimony that he was 'pushed,' 'grabbed,' 'pulled,' and 'manhandled'"). Viewed in the light most favorable to Plaintiff, many of his allegations with respect to the alleged excessive force do sound in intentional conduct; for example, Larrier and Wenzel "push[ed]" Plaintiff toward the front door, "pull[ed] [Plaintiff] up into a standing position," and ignored and "mocked" Plaintiff's repeated requests to loosen or check his handcuffs. (Pl.'s 56.1 ¶¶ 168, 171–72, 174–76.) Thus, a claim of negligence cannot co-exist with these allegations. However, the Court agrees with Plaintiff that a reasonable juror could find that failure to double-lock the handcuffs by Larrier and Wenzel, which Plaintiff appears to

allege may have led to his injury, could have been negligent, rather than intentional, and Plaintiff has not alleged any facts to the contrary. (*See* Pl.'s Mem. 23.) *See Hodge v. Village of Southampton*, 838 F. Supp. 2d 67, 88–89 & n.14 (E.D.N.Y. 2012) (finding that although the plaintiff alleged that the defendant intentionally caused his injury, a jury could reasonably conclude that the alleged contact between a car door and the plaintiff's leg was intentional or inadvertent, and thus, both claims survived summary judgment). Thus, Plaintiff's negligence claim against Larrier and Wenzel with respect to his handcuffing survives Defendants' Motion.

Additionally, Plaintiff's claims with respect to delay of proper medical care do not necessarily sound only in intentional conduct. For example, Plaintiff alleges that Larrier "did not make any attempt to communicate with . . . Wenzel or the WPPD dispatcher that [Plaintiff] was bleeding," "Wenzel . . . [did not] . . . take [Plaintiff] directly to the hospital," and Robinson "did nothing to take care of [Plaintiff's] injuries after he first observed him," without explicitly stating that such actions were intentional. (Pl.'s 56.1 ¶¶ 185, 191, 206.) Thus, Plaintiff has "produced sufficient evidence to create an issue of fact as to whether [Larrier, Wenzel, and Robinson] breached their duty to him in . . . delaying [P]laintiff's transportation to the hospital . . . and . . . denying [P]laintiff medical treatment." *Hodge*, 838 F. Supp. 2d at 89 (granting summary judgment with respect to plaintiff's claim of deliberate indifference to a serious medical need, but denying summary judgment with respect to plaintiff's claim of negligence against the same defendants). Plaintiff has also raised a negligence claim against the City of White Plains for failing to supervise its officers in the use of physical force, which Defendants do not appear to oppose in their Motion. (*See* Am. Compl. ¶ 148; *see generally* Defs.' Mem. 23; Defs.' Reply 9.) *See Scott v. City of Mount Vernon*, No. 14-CV-4441, 2017 WL 1194490, at *32 (S.D.N.Y. Mar. 30, 2017) ("For negligence claims under state law, a cause of action sounding in negligence is

legally sustainable against a city when the injured party demonstrates that he was injured due to the negligent training and supervision of a law enforcement officer." (citation and quotation marks omitted)).  And, because there are valid underlying claims of negligence, the assertion that Defendant White Plains is responsible under respondeat superior is also valid.  Accordingly, summary judgment on this ground is denied with respect to handcuffing claims against Wenzel and Larrier, denial and delay of medical care claims against Robinson, Larrier, and Wenzel, and failure to supervise claims against White Plains.

### c.  IIED

In New York, the elements of a claim for IIED are: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Howell v. N.Y. Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993).  "New York courts have imposed a very high threshold for [IIED] distress claims, requiring that the conduct must be so outrageous and extreme as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Druschke v. Banana Republic, Inc.*, 359 F. Supp. 2d 308, 314 (S.D.N.Y. 2005) (citation and quotation marks omitted).  Defendants argue that Plaintiff's IIED claims must be dismissed because the claim is duplicative of other claims alleged, and because Plaintiff does not allege conduct "so outrageous or extreme" to meet the IIED standard.  (Defs.' Mem. 23–25.)

"Federal courts in the Second Circuit agree that no [IIED] claim will lie where the conduct underlying the claim falls within the ambit of traditional tort liability."  *Garcia v. County of Westchester*, No. 11-CV-7258, 2017 WL 6375791, at *30 (S.D.N.Y. Dec. 12, 2017) (citation and quotation marks omitted); *see also Lopez v. City of New York*, No. 14-CV-1660,

2014 WL 5090041, at *4 (S.D.N.Y. Oct. 10, 2014) ("New York law considers IIED a theory of recovery that is to be invoked only as a last resort, and requires dismissal of an IIED claim based on conduct that falls within the ambit of other traditional tort liability." (citations and quotation marks omitted)); *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 528 F. Supp. 2d 303, 312 (S.D.N.Y. 2007) ("[R]elief [under IIED] is limited because a cause of action for [IIED] should not be entertained where the conduct complained of falls well within the ambit of other traditional tort liability." (footnote and quotation marks omitted)). Accordingly, courts have not hesitated to dismiss IIED claims where "the alleged conduct fits well within the traditional tort theories of false arrest, malicious prosecution, and assault and battery." *Yang Feng Zhao v. City of New York*, 656 F. Supp. 2d 375, 405 (S.D.N.Y. 2009); *see also Lopez*, 2014 WL 5090041, at *4 (dismissing IIED claim where "[t]he conduct underlying [the plaintiff's] IIED claim [was] entirely embraced by the traditional tort claims of false arrest, false imprisonment, malicious prosecution, and battery"); *Lee v. McCue*, 410 F. Supp. 2d 221, 227 (S.D.N.Y. 2006) (dismissing claim for negligent infliction of emotional distress because the "plaintiff's causes of action for battery and false arrest provide[d] a complete source of recovery for his injuries" (footnote omitted)), *appeal dismissed*, 218 F. App'x 26 (2d Cir. 2007).

Here, the alleged excessive force plainly falls within the torts of assault and battery. Further, the Court has determined that excessive force was not used in handcuffing and shackling Plaintiff at WPPD Station, and that Defendants were not deliberately indifferent to Plaintiff's medical needs. Thus, Plaintiff's claims for IIED are duplicative and, based on the longstanding precedent cited above, should be dismissed. Defendants' Motions are therefore granted with respect to Plaintiffs' claims of IIED.

### d.  Respondeat Superior

Plaintiff brings a separate claim for "respondeat superior."  (Am. Compl. ¶ 203.)

However, "respondeat superior is a theory of liability, not a freestanding cause of action."  *Scott*,

2017 WL 1194490, at *25 (citations omitted).  The Court has noted above where White Plains

may be responsible under the theory of respondeat superior.  (*See supra* Sections II.B.5.a;

II.B.5.b.)

### III.  Conclusion

For the foregoing reasons, the Court grants Defendants' Motion for Summary Judgment

with respect to Plaintiff's claims of (1) excessive force against Larrier and Wenzel as it relates to

the moments of Plaintiff's initial arrest; (2) excessive force and failure to intervene against

Robinson; (3) deliberate indifference to medical care against Larrier, Wenzel, and Robinson; (4)

supervisory liability against Larrier and Robinson; (5) state-law negligence as it relates to

excessive force other than the handcuffing of Plaintiff by Larrier and Wenzel; and (6) intentional

infliction of emotional distress against all Defendants.  The Court denies Defendants' Motion

with respect to Plaintiff's claims of (1) excessive force against Larrier and Robinson as it relates

to Plaintiff's alleged fall and handcuffing; (2) state-law assault and battery against White Plains,

Larrier, and Wenzel; and (3) state-law negligence against White Plains, Larrier, and Wenzel for

the handcuffing of Plaintiff and against White Plains, Larrier, Wenzel, and Robinson for alleged

delay in and denial of medical treatment.

The Clerk of the Court is respectfully directed to terminate the pending Motion. (Dkt.

No. 63.)

SO ORDERED.

DATED:     March 19, 2020
          White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE